

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

ENTERED
01/20/2009

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **CYPRESSWOOD LAND** | § | **Case No. 07-32437-H4-11** |
| **PARTNERS, I,** | § | |
| | § | |
| Debtor. | § | |

**MEMORANDUM OPINION ON DEBTOR'S FIRST AMENDED LIQUIDATING PLAN
OF REORGANIZATION**
[Docket No. 165]

**I. INTRODUCTION**

This case illustrates the risk that litigants take in opposing confirmation of a plan "on the cheap." In the case at bar, the two litigants who opposed the debtor's plan chose to bring no witnesses to the confirmation hearing or to introduce any of their own exhibits. Indeed, one of them chose not to file a written objection. Rather, they simply sent their counsel to the confirmation hearing hoping that their arguments alone could persuade this Court to deny confirmation of the proposed plan. This strategy failed. When the Debtor objected to their opposing confirmation by arguing that they both lacked standing, this Court sustained the objection on the grounds that one litigant had failed to prove up that it was a party-in-interest and that the other had failed to file a written objection.

This case also concerns a number of unresolved issues in Fifth Circuit jurisprudence, including what constitutes a "party-in-interest" under 11 U.S.C. § 1109(b), whether a non-voting class may be deemed to have accepted a Chapter 11 plan, and whether and to what extent the "new value exception" relating to 11 U.S.C. § 1129(b)(2)(B)(ii) should be recognized.

On December 19, 2008, this Court held a hearing on the Debtor's First Amended Disclosure

Statement [Docket No. 166] and First Amended Liquidating Plan of Reorganization [Docket No. 165], as modified by non-material modifications filed on December 17, 2008. [Docket No. 189.] At the close of the hearing, the Court took the matters under advisement. On December 29, 2008, this Court held a telephonic hearing to ask certain questions about various issues relating to the hearing held on December 19, 2008. On December 30, 2008, this Court issued oral findings of fact and conclusions of law in open court approving the First Amended Disclosure Statement and confirming the First Amended Liquidating Plan of Reorganization, as modified by non-material modifications filed on December 17, 2008 and additional non-material modifications made pursuant to the Court's ruling.

The Court now memorializes its oral findings of fact and conclusions of law with the written findings of fact and conclusions of law set forth herein. To the extent that the oral findings of fact and conclusions of law conflict, or are inconsistent with, any of the written findings of fact and conclusions of law set forth in this Memorandum Opinion, the latter shall govern. Further, to the extent that the written findings of fact and conclusions of law set forth herein do not memorialize all of the oral findings of fact and conclusions of law, then those oral findings of fact and conclusions of law not memorialized herein are incorporated herein as if fully set forth in writing so long as they do not conflict, or are inconsistent, with the written findings of fact and conclusions of law.

The Court makes these findings of fact and conclusions of law pursuant to Federal Bankruptcy Rules 7052 and 9014. To the extent that any finding of fact is construed as a conclusion of law, it is adopted as such. Moreover, to the extent that any conclusion of law is construed as a finding of fact, it is adopted as such. The Court reserves its right to make additional findings of fact

2

and conclusions of law as it deems appropriate or as may be requested by any of the parties.[1]

## II. FINDINGS OF FACT

1.     Cypresswood Land Partners, I (the Debtor) is a Texas joint venture that has two 50%

partners: Stephen A. Morrow (Morrow) and Redwood Properties, LLC (Redwood). [Ex. No.

2, pp. 4, 8, and 9] and [Ex. No. 5, p. 7.] Morrow and Redwood formed the Debtor for the

purpose of buying, developing, and selling approximately 23 acres located in Harris County,

Texas (the Property). [Ex. No. 2, p. 8.]   The Property consists of four tracts: (1)

approximately 6.210 acres (the 6.210 Acre Tract); (2) approximately 11.814 acres (the

11.814 Acre Tract); (3) approximately 3.599 acres (the 3.599 Acre Tract); and (4)

approximately .8760 acres (the .8760 Acre Tract). [Ex. No. 4, p. 2.] Unfortunately for the

Debtor, it was unable to develop and sell the Property as quickly as the Debtor had expected.

2.     On April 4, 2007, Morrow, in his capacity as a 50% venturer of the Debtor, filed an

involuntary Chapter 11 petition against the Debtor. [Docket No. 1.]

3.     On April 5, 2007, Morrow filed an amended involuntary Chapter 11 petition against the

Debtor. [Docket No. 2.]

4.     On April 27, 2007, Redwood, in its capacity as the other 50% venturer of the Debtor, filed

a pleading entitled: "Answer in Opposition to Involuntary Petition, Subject to Motion to

Dismiss or Abstain." [Docket No. 7.] In this pleading, Redwood requested the Court to deny

Morrow's request for the entry of an order for relief.   The attorney who filed this pleading

was Keavin D. McDonald (McDonald).   McDonald has represented Redwood throughout

---

[1] Any reference herein to "the Code" refers to the United States Bankruptcy Code.  Further, reference to any section (i.e. §) refers to a section in 11 U.S.C., which is the United States Bankruptcy Code.  Any reference to an Exhibit is a reference to one of the exhibits introduced by the Debtor; no other party introduced any exhibits.

this case and has frequently appeared at hearings held in this case.

5.      At separate hearings on June 1, 2007 and June 11, 2007, counsel for Morrow and counsel for Redwood represented to this Court that these two parties, plus certain creditors of the Debtor, had been conducting negotiations regarding the future of the Debtor. [Courtroom Minutes from the docket sheet for the hearings held on June 1, 2007 and June 11, 2007.] At their request, this Court continued the hearing on the Motion to Dismiss or Abstain. [Tape recording of hearing from June 11, 2007.]

6.      At a hearing on June 18, 2007, counsel for Morrow and counsel for Redwood announced that these two parties had reached an agreement that Redwood would drop its opposition to the involuntary petition, that Morrow would replace Redwood as the managing venturer of the Debtor, and that an order for relief would be submitted whereby the Debtor would voluntarily prosecute a plan of reorganization under Chapter 11.

7.      On June 22, 2007, this Court signed an Order for Relief expressly setting forth that the Debtor's case would proceed under Chapter 11 of the Bankruptcy Code (the Order for Relief). [Docket No. 12.]

8.      On July 12, 2007, the Debtor filed its Application for an Order Authorizing the Retention of the law firm of Beirne, Maynard & Parsons, LLP as counsel to the Debtor. [Docket No. 27.]

9.      On July 17, 2007, this Court signed an Order approving the Debtor's Application to Employ the law firm of Beirne, Maynard & Parsons, LLP as counsel to the Debtor. [Docket No. 34.]

10.     On July 20, 2007, the Debtor filed its original Schedules and Statement of Financial Affairs. [Docket Nos. 42 and 44; Ex. Nos. 4 and 5.] In Schedule A, the Debtor represented that the current value of each of the four tracts was, to use the Debtor's words, "the book value

4

(original purchase price)." With respect to the 6.210 Acre Tract, the Debtor represented that the value was $3,584,000.00. With respect to the 11.814 Acre Tract, the Debtor represented that the value was $5,103,663.00. With respect to the 3.599 Acre Tract, the Debtor represented that the value was $1,350,000.00. With respect to the .8760 Acre Tract, the Debtor represented that the value was $324,012.00. The sum of these four figures is $10,361,675.00.

11.   On July 27, 2007, the Debtor filed its Application for an Order Authorizing the Retention and Employment of Yancey-Hausman Interest, Inc. (YHI) as Real Estate Broker for the Debtor. [Docket No. 50.] This application expressly set forth that YHI would undertake the following services for the Debtor: (a) market the Property to facilitate the sale thereof; (b) take all necessary actions to sell the Property to prospective purchasers; (c) negotiate the business terms of such sale transactions on behalf of the Debtor; and (d) accept a deposit or other funds from any prospective purchaser of the Property. The Debtor filed this Application in order to accomplish the objective of selling the Property for the benefit of the Debtor's estate and its creditors.

12.   On August 8, 2007, this Court granted the Debtor's Application to Employ YHI. [Docket No. 54.] Unfortunately, between August 8, 2007 and December 19, 2008 (i.e. the date of the confirmation hearing), YHI, despite extensive efforts, was unable to locate any non-insider third party who was willing to purchase the Property. Based upon the very credible testimony of David Lee Carter (Carter), the Vice-President of investments at YHI, the Court finds that the actions taken by YHI to market and sell the Property included, but were not limited to, the following: (a) YHI advertised not only with on-site property signs, but also

did an email marketing campaign every two weeks to the brokerage community in the greater Harris County, Texas area; (b) YHI advertised on Co-Star, which is a real estate media outlet; (c) YHI advertised on Loop Net, which is another real estate media outlet; (d) YHI advertised both in Las Vegas and in San Antonio at the conventions of the International Council of Shopping Centers; and (e) YHI advertised at the Commercial Real Estate Exposition in Houston. Further, YHI performed a cost analysis for developing the Property, and concluded that the approximate cost of such development would be approximately $2.0 million to $2.5 million, an amount which the Debtor could not afford—thereby leaving YHI with no choice but to market the Property in its present condition (i.e. virtually undeveloped).[2] Initially, YHI marketed the Property at $12.00 per square foot, but received no offers. Eventually, YHI removed the asking price of $12.00 per square foot and simply marketed the Property by advertising that it would review any written offers at any price. However, no written offers were submitted.

13.  On August 22, 2007, this Court signed an Amended Agreed Order executed by counsel for the Debtor and counsel for Wallis State Bank (Wallis). [Docket No. 57.] This Order set forth certain stipulations, including, but not limited to, the following: (a) the Debtor executed a note dated May 16, 2005 in the original principal amount of $2,508,958.00, which was renewed and modified on May 16, 2006 (the Note); (b) Wallis is the present holder and owner of the Note; (c) the Note is secured by a first lien on the 6.210 Acre Tract; (d) as of July 19, 2007, the amount owing under the Note was at least $2,120,069.51 in principal and

---

[2] There are some storage units on the Property which the Debtor leases to various tenants. However, given the total amount of debts owed by the Debtor, the lease payments as a source of funds for repayment are *de minimis*.

6

$57,087.76 in accrued interest; and (e) the Note matured pursuant to its terms on May 21, 2007. The Court finds that no creditor or party-in-interest or any other third party has ever disputed these stipulations and the Court accepts these stipulations as facts for all purposes in this case. It is also undisputed, and the Court so finds, that the indebtedness owed by the Debtor to Wallis is guaranteed by Morrow, Redwood, and Robert A. Zamorano (Zamorano), who is the owner of Redwood.

14.     On October 18, 2007, the Debtor filed its first Motion to Extend the Exclusive Periods to (1) File a Chapter 11 Plan and (2) Solicit Acceptances Thereof. [Docket No. 65.] No one objected to this Motion within the 20-day period following its filing, and therefore on November 9, 2007, this Court signed an Order granting this Motion and extending exclusivity through December 31, 2007. [Docket No. 76.] Based upon the Certificate of Service associated with this particular Motion to Extend, the Court finds that on October 18, 2007, a copy of the Motion was sent to Integrated Financial Associates, Inc. (IFA) and to Keavin D. McDonald at the following respective addresses: 2810 W. Charleston Blvd., Suite 77, Las Vegas, NV 89102; and 4543 Post Oak Pl., #106, Houston, TX 77027. Accordingly, the Court finds that both IFA and Redwood, through its attorney, McDonald, had ample time to file a response in opposition to the relief requested by the Debtor, but chose not to do so.

15.     On October 23, 2007, this Court signed an Agreed Order executed by counsel for the Debtor and counsel for Regions Bank (Regions). [Docket No. 68.] This Order set forth certain stipulations, including, but not limited to, the following: (a) the Debtor executed a note dated August 6, 2004 in the original principal amount of $297,000.00; (b) the Debtor executed a note dated August 20, 2004 in the original principal amount of $2,703,000.00 (c) the Debtor

executed a note dated October 15, 2004 in the original principal amount of $1,150,000.00; (d) the indebtedness owed under these three notes is cross-collateralized; (e) these three notes are secured by a first lien on the 11.814 Acre Tract, the 3.599 Acre Tract, and the .8760 Acre Tract; (f) Regions is the present holder and owner of these three notes; and (g) as of May 31, 2007, the total amount of indebtedness owed under these three notes was in excess of $4,145,000.00.  The Court finds that no creditor or party-in-interest or any other third party has ever disputed these stipulations, and the Court accepts these stipulations as facts for all purposes in this case.  It is also undisputed, and the Court so finds, that the indebtedness owed by the Debtor to Regions is guaranteed by Morrow, Redwood, and Zamorano.

16.    On December 24, 2007, the Debtor filed its Second Motion to Extend the Exclusive Periods to (1) File a Chapter 11 Plan and (2) Solicit Acceptances Thereof. [Docket No. 88.]  No one objected to this Motion within the 20-day period following its filing, and therefore on January 16, 2008, this Court signed an Order granting this Motion and extending exclusivity through March 31, 2008. [Docket No. 97.]  Based upon the Certificate of Service associated with this particular Motion to Extend, the Court finds that on December 24, 2007, a copy of the Motion was sent to IFA and to Keavin D. McDonald at the following respective addresses: 2810 W. Charleston Blvd., Suite 77, Las Vegas, NV 89102; and 4543 Post Oak Pl., #106, Houston, TX 77027.  Accordingly, the Court finds that both IFA and Redwood, through its attorney, McDonald, had ample time to file a response in opposition to the relief requested by the Debtor, but chose not to do so.

17.    On March 27, 2008, the Debtor filed its Third Motion to Extend the Exclusive Periods to (1) File a Chapter 11 Plan and (2) Solicit Acceptances Thereof. [Docket No. 102.]  No one

8

objected to this Motion within the 20-day period following its filing, and therefore on April 18, 2008, this Court signed an Order granting this Motion and extending exclusivity through June 30, 2008. [Docket No. 105.] The Debtor did not seek a further extension of the exclusivity period, which expired on June 30, 2008. Based upon the Certificate of Service associated with this particular Motion to Extend, the Court finds that on March 27, 2008, a copy of the Motion was sent to IFA and to Keavin D. McDonald at the following respective addresses: 2810 W. Charleston Blvd., Suite 77, Las Vegas, NV 89102; and 4543 Post Oak Pl., #106, Houston, TX 77027. Accordingly, the Court finds that both IFA and Redwood, through its attorney, McDonald, had ample time to file a response in opposition to the relief requested by the Debtor, but chose not to do so.

18.     On July 9, 2008, IFA filed a Motion for Adequate Protection. [Docket No. 117.] In this Motion, IFA asserts that: (a) in November of 2005, it made a loan to Redwood in the original principal amount of $7,000,000.00; (b) this loan is secured by a first lien on approximately 16.4 acres of real property in Harris County, Texas that is owned by Redwood; and (c) this loan is secured by a second lien on all assets owned by the Debtor, including the Property, which lien attached prior to the filing of this case. IFA has stipulated that the Debtor is not personally liable to IFA because the Debtor has never signed any promissory note held by IFA. The Debtor has stipulated that IFA has made a loan to Redwood, and that this loan is secured by a first lien on property of Redwood. The Debtor vehemently disputes that this loan is also secured by a second lien on any assets of the Debtor.

19.     On July 9, 2008, IFA's counsel, John P. Melko, filed a Notice of Appearance and Request

for Notices. [Docket No. 118.]

20.     On July 27, 2008, Regions filed an Objection to IFA's Motion for Adequate Protection. [Docket No. 121.]

21.     On  July 29, 2008, the Debtor filed a Response to IFA's Motion for Adequate Protection. [Docket No. 124.] In this Response, the Debtor admits that IFA made a loan to Redwood but denies that IFA holds a valid second lien on any assets of the Debtor.  Indeed, in its original Schedule D filed on July 20, 2007, the Debtor scheduled IFA's claim as a disputed secured claim.  [Docket No. 42.]

22.     On July 29, 2008, the Debtor filed a Complaint against IFA, Redwood, and Zamorano for fraudulent transfer and breach of fiduciary duties. [Docket No. 123; Adv. Docket No. 1.] This suit was assigned adversary proceeding number 08-3271 (the Adversary Proceeding). Zamorano is the manager of Redwood.  The Complaint alleges, among other things, that neither Zamorano (in either his individual capacity or his capacity as manager of Redwood) nor Redwood (acting as managing venturer of the Debtor) had the authority to execute the deed of trust conveying a second lien on the Debtor's assets to secure the loan that IFA had made to Redwood.  The relief requested by the Debtor, among other things, is that this Court avoid the second lien that IFA asserts it holds on the Property and require IFA to file a Withdrawal of Lien with the County Clerk of Harris County, Texas.

23.     On July 30, 2008, Wallis filed its Objection to IFA's Motion for Adequate Protection. [Docket No. 127.]

24.     On July 31, 2008, IFA filed a Motion to Continue the Hearing on IFA's Motion for Adequate Protection (the Motion to Continue) [Docket No. 128], and on August 1, 2008, this Court

signed an Order scheduling a hearing on the request for the continuance. [Docket No. 131.] At this hearing, which was held on August 1, 2008, this Court granted the Motion to Continue. As of the undersigned date, the Court has held no hearing on the merits nor issued any ruling on IFA's Motion for Adequate Protection. IFA has never requested the Court to hold a hearing on its Motion for Adequate Protection since the Court granted the continuance at the August 1 hearing.

25.  On August 20, 2008, in the Adversary Proceeding, IFA filed its Answer requesting that the Court deny all relief requested by the Debtor. [Adv. Docket No. 9.]

26.  On August 28, 2008, in the Adversary Proceeding, Redwood and Zamorano filed their Original Answer to Complaint, demanded a jury trial in this Court, and requested the Court to issue an order denying the Debtor all relief requested. [Adv. Docket No. 10.]

27.  As of the undersigned date, no trial in the Adversary Proceeding has been held. Trial on the merits is presently scheduled to be held on April 6, 2009. [Adv. Docket No. 4.]

28.  On September 22, 2008, which was eighty-four (84) days after the exclusivity period had run, the Debtor filed its initial Chapter 11 Plan of Reorganization and Disclosure Statement (the Initial Plan and the Initial Disclosure Statement). [Docket Nos. 140 & 141.] Additionally, the Court finds that both IFA and Redwood had these eighty-four (84) days to file their own proposed plans but chose not do so. Further, the Court finds that both IFA and Redwood had the opportunity to submit bids to YHI for purchasing all, or a portion of, the Property, but chose not to avail themselves of this opportunity.

29.  On September 24, 2008, this Court signed an Order setting a hearing on the Initial Plan and the Initial Disclosure Statement. [Docket No. 144.] This Order reflects that the hearing on

the Initial Plan and Initial Disclosure Statement was to be held on November 3, 2008, and that the deadline for filing objections to the Initial Plan and the Initial Disclosure Statement was on or before 4:00 p.m. on October 27, 2008.

30.    On September 30, 2008, counsel for the Debtor filed a certificate of service representing that on September 26, 2008, a packet containing the Initial Plan, the Initial Disclosure Statement, and the Court's Order of September 24, 2008, plus a ballot, was sent to those persons and entities listed on the "Service List" attached to the Certificate of Service. [Docket No. 146.] Among those on the Service List were the following names and addresses: (a) Integrated Financial Associates, 2810 W. Charleston Blvd., Suite 77, Las Vegas, NV 89102; and (b) Keavin D. McDonald, P.C., 4543 Post Oak Pl., #106, Houston, TX 77027.

31.    On October 25, 2008, Regions filed an Objection to the Initial Plan and a ballot voting against the Initial Plan. [Docket Nos. 152 & 154.] On this same date, Regions filed an Objection to the Initial Disclosure Statement. [Docket No. 153.]

32.    On October 27, 2008, Wallis filed an Objection to the Initial Plan and a ballot voting against the Initial Plan. [Docket Nos. 155 & 156.]

33.    On October 27, 2008, IFA filed an Objection to Approval of the Initial Disclosure Statement and the Initial Plan. [Docket No. 158.]

34.    On October 31, 2008, the Debtor filed a Motion for Continuance of Hearings on Confirmation and Disclosure Statement. [Docket No. 160.] In this Motion, the Debtor requested that the scheduled hearing of November 3, 2008 on the Initial Disclosure Statement and Initial Plan be continued.

35.    On November 3, 2008, at the scheduled hearing on the Initial Disclosure Statement and

Initial Plan, counsel for the Debtor announced that the Debtor would file an amended plan and amended disclosure statement on or before November 12, 2008 or else the Debtor would agree to convert the case to Chapter 7. [Courtroom Minutes from the docket sheet.] Also appearing at this hearing were counsel for Regions, counsel for Wallis, counsel for IFA, and counsel for the United States Trustee; none of these individuals objected to the announcement made by counsel for the Debtor.

36.     On November 10, 2008, this Court signed an Order requiring the Debtor to file an amended disclosure statement and amended plan by November 12, 2008 or else the case would be converted to a Chapter 7. [Docket No. 164.]

37.     On November 12, 2008, the Debtor filed its Amended Disclosure Statement (the Amended Disclosure Statement) and Amended Plan (the Amended Plan). [Docket Nos. 165 & 166.] The Court finds that the Amended Plan is a liquidating plan because it provides for the liquidation of all assets of the Debtor's bankruptcy estate.

38.     On November 14, 2008, this Court signed an Order setting a hearing on the Amended Disclosure Statement and the Amended Plan. [Docket No. 174.] This Order reflects that the hearing on the Amended Disclosure Statement and the Amended Plan was set for December 19, 2008, and that the deadline for filing objections to the Amended Disclosure Statement and the Amended Plan was by 4:00 p.m. on December 12, 2008.

39.     On December 17, 2008, counsel for the Debtor filed a certificate of service representing that on November 17, 2008, the (A) First Amended Liquidating Plan of Reorganization; (B) First Amended Disclosure Statement with Respect to Debtor's First Amended Liquidating Plan of Reorganization; (C) Order; (1) Setting Hearing to Consider Confirmation of the Debtor's

First Amended Liquidating Plan of Reorganization; (2) Setting Hearing to Consider Approval of Debtor's First Amended Disclosure Statement with Respect to Debtor's First Amended Liquidating Plan of Reorganization; (3) Scheduling Deadline for Submitting Ballots; and (4) Establishing Deadline for Filing Objections Thereto; and (D) Ballots for Accepting or Rejecting the Amended Plan were sent to those persons and entities listed on the "Service List" attached to the Certificate of Service. [Docket No. 188.]  Among those on the Service List were the following names and addresses: (a) Integrated Financial Associates, 2810 W. Charleston Blvd., Suite 77, Las Vegas, NV 89102; and (b) Keavin D. McDonald, P.C., 4543 Post Oak Pl., #106, Houston, TX 77027.  Redwood never filed a written objection to either the Amended Disclosure Statement or the Amended Plan.

40.     On December 9, 2008, IFA filed its Objection to Confirmation of the Amended Plan. [Docket No. 187.]  IFA did not, however, file an objection to the Amended Disclosure Statement; therefore, the only live objection that IFA has pending is its Objection to Confirmation of the Amended Plan.  In IFA's Objection to Confirmation of the Amended Plan, IFA sets forth the following three arguments:

(a)     The Amended Plan is not fair and equitable because Regions and Wallis will be paid in full when the Purchaser assumes their loans, while IFA will receive nothing;

(b)     The Amended Plan violates the absolute priority rule by allowing Morrow to retain an interest in the Debtor despite Morrow's partnership interest being junior to IFA's alleged second lien on the Property; and

(c)     Section 11.5 of the Amended Plan purports to release non-debtor third parties (such

as guarantors) from liability without any contribution from those third parties.[3]

41.     On December 17, 2008, the Debtor filed its Notice of Non-Material Modifications to Plan and Disclosure Statement. [Docket No. 189.] This Notice sets forth certain modifications which the Debtor made to the Amended Disclosure Statement and the Amended Plan.

42.     On December 17, 2008, Regions filed a ballot voting in favor of the Amended Plan. [Docket No. 192.] The ballot reflects that the amount owed to Regions as of November 19, 2008 is approximately $4,155,000.00, plus interest, costs, attorneys' fees, expenses, and other charges allowed by applicable law and by the loan documents. [Ex. No. 3.] To the extent that Regions voted against the Initial Plan, it has now changed its position and voted in favor of the Amended Plan. Therefore, Regions has no objection to the Amended Disclosure Statement or the Amended Plan.

43.     On December 17, 2008, Wallis filed a ballot voting in favor of the Amended Plan. [Docket No. 193.] The ballot reflects that the amount owed to Wallis as of December 10, 2008 is approximately $2,046,717.97, plus interest, costs, attorneys' fees, expenses, and other charges allowed by applicable law and by the loan documents. [Ex. No. 3.] To the extent that Wallis voted against the Initial Plan, it has now changed its position and voted in favor of the Amended Plan. Therefore, Wallis has no objection to the Amended Disclosure Statement or the Amended Plan.

44.     IFA sent to counsel for the Debtor a ballot voting against the Amended Plan. [Ex. No. 3.] The ballot reflects that the amount owed to IFA is $7,300,000.00, plus interest and attorneys'

_____

[3] At the confirmation hearing, counsel for the Debtor represented to the Court that the Amended Plan in no way seeks to release non-debtor third parties from liability. Accordingly, this particular objection was resolved at the outset of the hearing.

fees. [Ex. No. 3.]

45.     On December 19, 2008, this Court held a hearing on the Amended Disclosure Statement and the Amended Plan. The following attorneys appeared: (1) J. Seth Moore for the Debtor; (2) Preston T. Towber for Wallis; (3) Trent L. Rosenthal for Regions; (4) David S. Elder for IFA; and (5) Keavin D. McDonald for Redwood.

46.     As of December 19, 2008, only nine (9) proofs of claim had been filed in this case. IFA has not filed a proof of claim. A summary of the proofs of claim that have been filed is set forth below:

(a) Claim Number 1: Prestonwood Forest Utility District for the amount of $725.20, with the amount being asserted as a fully secured claim;

(b) Claim Number 2: Harris County M.U.D. #230 for the amount of $70,914.17, with the amount being asserted as a fully secured claim;

(c) Claim Number 3: Diana Edgington for the amount of $3,040.00, with $40.00 asserted as a priority claim and the remaining $3,000.00 asserted as a general unsecured claim;

(d) Claim Number 4: Regions Bank for the amount of $4,150,000.00, with the amount being asserted as a fully secured claim;

(e) Claim Number 5: Wallis State Bank for the amount of $2,126,709.44, with the amount being asserted as fully secured claim;

(f) Claim Number 6: Cypress Fairbanks ISD for the amount of $1,272.83, with the amount being asserted as a fully secured claim;

(g) Claim Number 7: Harris County for the amount of $3,563.42, with the amount being asserted as a fully secured claim;

(h) Claim Number 8: Harris County for the amount of $40,533.28, with the amount being asserted as a completely unsecured claim; and

(i) Claim Number 9: Cypress Fairbanks ISD for the amount of $66,253.27, with the amount being asserted as a completely unsecured claim.

[Claims Register.]

47.   Under the Amended Plan, all classes are impaired.  Class 1 consists solely of Regions's secured claim.  Class 2 consists solely of Wallis' secured claim.  Class 3 contains the disputed secured claim of IFA.  Class 4 contains all allowed unsecured claims.  Class 5 consists of the partnership interests of the Debtor's two partners, Morrow and Redwood.

48.   Based upon the very credible testimony of Carter, the Court finds the Property has declined in value since the Debtor's original Schedules were filed on July 20, 2007 due to the present severe financial crisis affecting the country, including the deterioration of capital markets. According to Carter, these circumstances have inhibited the development of, and the ability to sell, the Property.  Carter further testified that the value of the Property at this time is probably between $6.00 per square foot and $7.00 per square foot, which translates into a total value of approximately $5.9 million to $6.9 million.  Carter further testified that given the severity of the financial crisis presently confronting the country, the value of the Property will probably decline further to as low as $4.00 per square foot; at that value, the Property would be worth approximately $3.9 million.[4]  After hearing this testimony from Carter, the

---

[4] The Property is 22.6 acres.  There are 43,560 square feet per acre.  Therefore, the Property is 984,456 square feet (i.e. 22.6 acres multiplied by 43,560 square feet).  The 984,456 square feet multiplied by each of the three values per square foot (i.e. $7.00 per square foot, $6.00 per square foot, and $4.00 per square foot) equals $6.9 million, $5.9 million, and $3.9 million, respectively.

Court finds that the present fair market value of the Property is approximately $6.0 million. The Court makes this finding based upon the $5.9 million to $6.9 million range testified to by Carter, taking into account his additional testimony that the severe economic crisis is causing, and will continue to cause, the value of the Property to decline to as low as $3.9 million.

49. Based upon the debt figures set forth in the ballots filed by Regions and Wallis voting in favor of the Amended Plan, the Court finds that the current amount of aggregate indebtedness owed by the Debtor to these two lenders is $6,201,717.97 (i.e. $4,155,000.00 + $2,046,717.97). The Court further finds that this figure does not include reasonable attorneys' fees and costs to which Regions and Wallis assert they are entitled under their respective loan documents.

50. Based upon this Court's finding that the value of the Property is $6.0 million and that the amount of aggregate indebtedness owed by the Debtor to Regions and Wallis is $6,201,717.97, the Court finds that IFA's second lien on the Property, even if valid, is worthless because the value of the Property does not exceed the aggregate amount of the senior liens held by Regions and Wallis. Indeed, because there are several hundred thousand post-petition ad valorem taxes due on the Property, the aggregate amount of liens senior to the alleged lien held by IFA is not just $201,717.97, but substantially more. Further, because there is no equity in the Property, Morrow and Redwood's partnership interests in the Debtor are also worthless. Finally, aside from the Property, the only other assets of the Debtor are cash of $14,000.00, *de minimus* accounts receivable, and the Debtor's claims in the Adversary Proceeding. Adding the value of these assets to the value of the Property does not

change this Court's finding that the partnership interests of Morrow and Redwood in the Debtor are worthless. The Debtor's aggregate current liabilities exceed the current fair market value of its assets.

51. Based upon the very credible testimony of Morrow, the Court finds that Morrow has personally invested more than $700,000.00 in cash to help fund the operations of the Debtor. Because Morrow contributed this $700,000.00 over the past year and a half, the Court finds that Morrow has substantial wealth. Further, the Court finds that Morrow will be able to successfully manage the Adversary Proceeding for the reorganized Debtor in a manner that has a reasonable likelihood of providing unsecured creditors more money than they would otherwise receive if the case were converted to Chapter 7.

52. Based upon Morrow's very credible testimony, the Court finds that the Debtor is current on its fees to the United States Trustee.

53. Morrow also testified that he was "the only show in town" who is willing to pay fair market value for the Property and that the sale under the Amended Plan is proposed in good faith and not merely to extinguish the interests of IFA or Redwood. The Court finds that neither IFA nor Redwood has ever submitted a written offer to purchase the Property, in whole or in part.

54. Based upon Morrow's testimony, the Court finds that Grace Interests, LLC (the Purchaser)—an entity formed and owned by Morrow and his wife [Docket No. 165, p. 7]—proposes to give the reorganized Debtor the following consideration for a transfer of the Property to the Purchaser: (1) the Purchaser will assume the Debtor's obligations under the loan documents with Regions and Wallis (i.e. assume approximately $6.2 million of claims

owed by the Debtor); (2) the Purchaser will pay all allowed tax claims owing on the Property (i.e. approximately $700,000.00); (3) the Purchaser will pay all allowed administrative claims in this case (i.e. approximately $300,000.00); (4) Morrow will surrender his general unsecured claim[5] and administrative claim against the Debtor (i.e. Morrow's claims against the Debtor arising from his using $700,000.00 of his personal funds to pay for specific obligations of the Debtor's estate, namely, taxes, attorneys' fees, accountants' fees, and monthly payments to Regions and Wallis); and (5) the Purchaser will fund the reorganized Debtor's litigation of the Adversary Proceeding.   The transfer of the Property to the Purchaser will be a sale free and clear of all liens and interests except the liens of Regions and Wallis.

55.     Morrow also testified very credibly that the objective of the Amended Plan—to maximize payment of claims—would not be accomplished without the protections afforded by Chapter 11 and that he believes Regions and Wallis would have foreclosed on their respective senior liens on the Property if the Debtor had not been in a Chapter 11.   The Court finds that Regions and Wallis would have foreclosed their liens if there had been no Chapter 11 case. The Court further finds that if Regions and Wallis had foreclosed their liens, there would have been no Chapter 11 petition ever filed.   The Court further finds that if no Chapter 11 petition had ever been filed, then no Adversary Proceeding would ever have been initiated and therefore there would be no lawsuit from which the reorganized Debtor might collect any

---

[5] The Amended Plan recites that, as part of the total consideration, Morrow will waive his unsecured claims; however, Morrow has no unsecured claim to waive because the Schedules do not list any such claim nor has Morrow himself filed a proof of claim asserting that he has an unsecured claim.  However, based upon his testimony, Morrow does have an administrative claim for monies that he himself paid on behalf of the Debtor during the pendency of this Chapter 11 case, including payment of taxes on the Property and attorneys' fees.

funds to pay unsecured claims, in part if not in whole.

56.     Regions has stipulated that if this Court confirms the Amended Plan, it will release its lien

on the cash and accounts receivables of the Debtor. The Debtor presently has approximately

$14,000.00 in cash on hand and uncollected receivables that, if collected, will probably not

exceed $10,000.00.[6]

57.     IFA has stipulated that the liens held by Regions and Wallis on the Property are superior to

any lien that IFA claims to hold on the Property.

### III. CREDIBILITY OF WITNESSES

At the hearing on the Amended Disclosure Statement and the Amended Plan, this Court

heard testimony from two witnesses, both of whom were called by the Debtor: (1) Stephen A.

Morrow; and (2) David Lee Carter. The Court finds that both of these witnesses were very credible.

Morrow gave testimony regarding the requirements necessary to be satisfied under 11 U.S.C. §§

1129(a) and (b). Among the issues about which he testified is that the new entity (i.e. the Purchaser)

will purchase the Property from the reorganized Debtor following confirmation of the Amended

Plan. For his part, Carter testified, among other issues, about the efforts that YHI made to market

and sell the Property during the pendency of this Chapter 11 case. He also testified about the current

market value of the Property and how the deteriorating capital markets have inhibited the Debtor's

---

[6] The liquidation analysis provided by the Debtor shows that the Debtor has available cash of $14,000.00, and this figure was verified at the confirmation hearing. Additionally, the Debtor has *de minimis* accounts receivable that, if collectible at all, will not bring the available cash total beyond $25,000.00 or so. Regions has a first lien on these particular assets, but, pursuant to a stipulation made by counsel for Regions at the confirmation hearing, because the Amended Plan is being confirmed, Regions is releasing its lien on the cash and the receivables. IFA asserts that it has a second lien on these assets, and assuming that this lien is valid—an issue which this Court will adjudicate in the Adversary Proceeding—then this second lien would become the only lien on these assets and IFA would be entitled to foreclose its lien on these assets. However, if this Court issues a ruling that IFA's second lien is invalid, then the cash and receivables would be unencumbered assets that would be used, together with any monies recovered by the reorganized Debtor from the Adversary Proceeding, to pay unsecured claims.

development of, and ability to sell, the Property.

## IV. Conclusions of Law

### A.    Jurisdiction and Venue

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This contested matter is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (L), and (O). Venue is proper pursuant to 28 U.S.C. § 1408.

### B.    IFA does not have standing to object to the Amended Plan.

IFA has objected to the Amended Plan on three separate grounds. [Finding of Fact No. 40.] 11 U.S.C. § 1128(b) states that "[a] party in interest may object to confirmation of a plan." Thus, IFA must be a party-in-interest to object to the Amended Plan in the case at bar. A determination of whether IFA is a party-in-interest requires an examination of § 1109. Section 1109(b) states that "[a] party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may raise and may appear and be heard on any issue in a case under this chapter." Thus, the initial inquiry is whether IFA comes within any of the seven enumerated categories set forth in this section. If the answer is in the affirmative, then IFA is a party-in-interest and, accordingly, would have standing to object to the Amended Plan.

Given the facts in this case, the only category into which IFA could conceivably fit is that of a "creditor." Because 11 U.S.C. § 101(10) defines "creditor," this particular provision governs in the case at bar. Section 101(10) expressly sets forth that an entity is a "creditor" if one of three conditions exist. First, under § 101(10)(A), an entity is a "creditor" if it "has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor." Here, it is

22

undisputed that IFA has no claim against the Debtor personally because the Debtor has never signed any promissory note held by IFA. [Finding of Fact No. 18.] Accordingly, IFA is not a "creditor" under § 101(10)(A).

The second way for an entity to achieve "creditor" status is through § 101(10)(B). This provision states that an entity is a "creditor" if it "has a claim against the estate of the kind specified in section 348(d), 502(f), 502(g), 502(h), or 502(i) of this title." IFA asserts that it has a second lien on all assets of the Debtor's estate, [Finding of Fact No. 18], a position which the Debtor vehemently challenges. [Finding of Fact No. 21.] There is no need for this Court to adjudicate at this time whether IFA's lien is valid in order to determine whether IFA is a "creditor." It is undisputed that IFA asserts that it holds a lien on property of the Debtor's estate based upon a transaction that occurred *pre-petition*, [Finding of Fact No.18]; whereas, for an entity to be a "creditor" under § 101(10)(B), it must hold a claim that has arisen by virtue of *post-petition* events that have occurred. This is so because any claim that an entity holds pursuant to §§ 348(d), 502(f), 502(g), 502(h), or 502(i) can only be a claim that arose post-petition.[7] Because IFA, by its own admission, acknowledges that any lien it holds arose from only pre-petition events, [Finding of Fact No. 18], it necessarily follows that IFA cannot possibly hold any claim arising from post-petition events. Accordingly, IFA cannot, as a matter of law, be a "creditor" under § 101(10)(B).

---

[7] 11 U.S.C. § 348(d) involves claims against the Debtor or its bankruptcy estate "that arise[] *after* the order for relief but before conversion [to Chapter 11, 12, or 13]." (emphasis added).
   11 U.S.C. § 502(f) involves claims in an involuntary case that "arise[] in the ordinary course of the debtor's business or financial affairs *after* the commencement of the case but before the earlier of the appointment of a trustee and the order for relief." (emphasis added).
   11 U.S.C. § 502(g) involves claims given to entities injured by the *post-petition* rejection of an executory contract or unexpired lease, either under section 365 or under a plan of reorganization.
   11 U.S.C. § 502(h) involves claims given to a transferee of a setoff that is recovered *post-petition* by the trustee.
   11 U.S.C. § 502(i) involves priority tax claims that do "not arise until *after* the commencement of the case." (emphasis added).

23

The third, and only other, way for an entity to be a "creditor" is if that entity "has a community claim" under § 101(10)(C). In the case at bar, IFA cannot, as a matter of law, hold a community claim because IFA is not a spouse. Thus, IFA may not achieve the status of "creditor" under this particular provision.

Under § 101(10), IFA has three separate and distinct chances to achieve "creditor" status. The discussion above reflects that IFA has struck out in all three instances. Accordingly, IFA is not a "creditor." It follows therefore that IFA cannot achieve the status of a "party in interest" under § 1109(b) by being a "creditor." And, as noted above, IFA does not fit into any of the six other expressly enumerated categories set forth in § 1109(b). Thus, IFA cannot achieve "party in interest" status by coming within any of the seven enumerated categories.

This does not end the inquiry, however. The universe of entities that can be a "party in interest" is not restricted solely to those seven enumerated entities. This is so because the first five words of § 1109(b) are "[a] party in interest, *including* [the seven enumerated categories]. . . ." (emphasis added). The word "including" is a term of art under the Bankruptcy Code. Section 102(3) states that "[i]n this title . . . 'includes' and 'including' are not limiting." Thus, the appropriate construction of § 1109(b) is that although there are seven enumerated categories for an entity to achieve "party in interest" status, even if an entity does not fall within one of these specific categories, the entity may still gain "party in interest" status by fitting into some undefined eighth category. Otherwise, § 102(3) has no meaning; and it is black letter law that Congress does not pass statutes that have no meaning. *See Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 216 (1995) (interpretation that would leave a statute "utterly without effect" is "a result to be avoided if possible"); *see also* 2A Norman J. Singer, Statutes and Statutory Construction § 46:06 (6th ed. 2000)

24

("A statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant, and so that one section will not destroy another unless the provision is the result of obvious mistake or error.") (footnotes omitted).

For those entities that do not fit within the seven enumerated categories of § 1109(b), but still want to gain "party in interest" status, they must look to case law. *In re A.P.I., Inc.*, 331 B.R. 828 (Bankr. D. Minn. 2005) is a recent case which aptly articulates the requirements which an entity must satisfy to achieve "party in interest" status:

> Over several decades of jurisprudence, the Supreme Court has formulated a two-component test to enable the federal courts to determine the standing of complainants before them. Such parties must demonstrate both constitutional and prudential standing.
>
> . . . . To meet the requirement of constitutional standing, [a party] must show that it has suffered an 'injury in fact' that is: concrete and particularized and actual or imminent; fairly traceable to the challenged action of the [opposing party]; and likely to be redressed by a favorable decision. The party must have such a *personal stake* in the outcome of the controversy as to assure . . . concrete adverseness. The injury-in-fact must be palpable, though this requirement is not onerous. The injury need not be current; even a threatened injury will suffice.
>
> Once a party has met these constitutional requirements, its standing may yet be challenged on three "prudential" grounds. . . . A complainant's bid for standing may be defeated if: (a) it is asserting a third party's rights; (b) it alleges a generalized grievance rather than an injury particular to it; or (c) it asserts an injury outside the zone of interest the statute was designed to protect.

*Id.* at 857-58 (internal marks and citations omitted) (emphasis in original).

In the case at bar, IFA introduced no evidence at all to demonstrate constitutional standing. Accordingly, based upon the record made at the confirmation hearing, IFA does not come within hailing distance of showing that confirmation of the Amended Plan would result in IFA suffering an injury in fact that is concrete, particularized, and either actual or imminent. Nor does IFA come near to showing that a favorable decision from this Court—i.e. sustaining IFA's objection and not

confirming the Amended Plan—would redress any injury to IFA.  The only material, undisputed facts that this Court has about IFA's loan is that it extended financing to Redwood that is secured by a first lien on assets which are *not* property of the Debtor's estate.  [Finding of Fact No. 18.] Given this paucity of facts, the Court cannot possibly conclude that confirmation of the Amended Plan would injure IFA; and, conversely, this Court cannot conclude that its refusal to confirm the Amended Plan would affect IFA's loan to Redwood.

In the Objection, IFA alleges that its loan to Redwood is secured by a second lien on the Property and that confirmation of the Amended Plan will extinguish this lien—which this Court presumably should accept as proof of injury to IFA.  Putting aside the fact that the Debtor vigorously disputes the validity of this second lien, [Finding of Fact No. 21], that IFA has not filed a proof of claim, [Finding of Fact No. 46], and that even if IFA's second lien were valid, there is no equity in the Property to pay any portion of this lien, [Finding of Fact No. 50], IFA has a more immediate problem in showing harm, actual or imminent.  It introduced no evidence whatsoever on any of the following issues:

(1) What is the present balance of the loan to Redwood?

(2) What is the value of the non-estate assets that secure this balance?

(3) Is IFA oversecured by the first lien that it holds on these non-estate assets?

(4) Even if IFA is not oversecured, has Redwood defaulted on its loan to IFA?

(5) Even if Redwood is in default, does IFA hold any guaranties?

(6) If there are guarantors, is their net worth sufficient to pay the balance of the loan?

IFA needed to introduce evidence on these issues in order to convince this Court that confirmation of the Amended Plan would cause injury to IFA that is concrete and particularized,

26

actual or imminent, or fairly traceable to the Amended Plan's treatment of IFA. For example, if IFA had introduced testimony that the balance of the loan to Redwood materially exceeds the value of the non-estate collateral, that the loan is in default, and that the guarantors have insufficient assets to retire the balance, then IFA would have at least taken a step forward in demonstrating that confirmation of the Amended Plan, by extinguishing IFA's second lien on the Property, might harm IFA's ability to collect the loan. IFA chose, however, to introduce no evidence on these issues and, therefore, must suffer the consequences of having no record to support its position.

Of course, even if IFA had introduced such evidence, it also needed to convince this Court that the Property has sufficient value to retire not only the superior liens held by Regions, Wallis, and the taxing authorities, but also to retire—in part, if not in whole—the balance owed under the loan made by IFA to Redwood. IFA, however, failed to introduce any such evidence. Instead, it chose to call no witnesses and introduce no exhibits. Rather, IFA's counsel simply cross-examined the Debtor's witnesses on the Property's value—and, in so doing, failed to convince this Court that the Property's value exceeds the senior liens held by Regions, Wallis, and the taxing authorities. Thus, even if the Debtor stipulated that IFA's second lien was valid, IFA would not be able to demonstrate that confirmation of the Amended Plan would actually injure its ability to collect the loan from Redwood. Elimination of a second lien on property with no equity hardly constitutes harm to collection of the loan by the second lienholder.

For all of the reasons set forth above, the Court concludes that IFA has failed to demonstrate that it has constitutional standing. Accordingly, because IFA has no constitutional standing, IFA is not a party-in-interest under 11 U.S.C. § 1109(b); therefore, IFA has no standing to object to the

Amended Plan under § 1128(b).[8]  Because it has no standing, its objection is overruled.

**C.    Even if IFA has standing to object to the Amended Plan, IFA may only object to those provisions of the Amended Plan that directly affect its interest.**

Even if IFA could be classified as a party-in-interest, it only has standing to object to provisions of the Amended Plan that directly affect its interest.   Courts across the nation have determined that parties-in-interest may only object to plan provisions that "directly implicate its own rights and interests."  *In re Quigley Co., Inc.*, 391 B.R. 695, 705 (Bankr. S.D.N.Y. 2008).[9]

In IFA's Objection to confirmation of the Amended Plan [Docket No. 187], IFA sets forth three arguments: (1) that the Amended Plan is not fair and equitable, (2) that it violates the absolute priority rule, and (3) that it releases third-party guarantors. [Finding of Fact No. 40.] The third objection is moot because the Debtor has stipulated that the Amended Plan does not release third-party guarantors.   With respect to the other two arguments, this Court concludes that neither has merit.   IFA may not object to the Amended Plan on the grounds that it is not fair and equitable because it is deemed to have accepted the Amended Plan and is thus not entitled to raise an objection under § 1129(b).  *See infra* section IV(G)(8).   Further, IFA may not object to the Amended Plan on

---

[8] With the Court having determined that IFA fails to satisfy constitutional standing requirements, the Court will not address whether IFA can demonstrate prudential standing.

[9] The Bankruptcy Court for the Southern District of New York compiled an extensive list of cases in support of this proposition: *In re Johns-Manville Corp.*, 68 B.R. 618, 623 (Bankr. S.D.N.Y. 1986) ("[N]o party may successfully prevent the confirmation of a plan by raising the rights of third parties who do not object to confirmation."), *aff'd*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd sub nom. Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 843 F.2d 636, 644 (2d Cir. 1988); *Greer v. Gaston & Snow (In re Gaston & Snow)*, No. 93 Civ. 8517(JGK), 1996 WL 694421, at *7 (S.D.N.Y. 1996) (creditor who did not allege that he would receive more under a chapter 7 liquidation than under the plan cannot argue that the plan violated the "best interest of the creditors" test as to other creditors); *Tascosa Petrol. Corp.*, 196 B.R. at 863 (class 5 creditor could not assert rights of class 4 creditors in objecting to plan); *In re Evans Prods. Co.*, 65 B.R. 870, 874 (S.D. Fla. 1986) (affiliated debtors lacked standing "to raise the rights of wrongly classified creditors as a means to attack the overall reorganization plan"); *In re Simplot*, No. 06-00002-TLM, 2007 WL 2479664, at *10 (Bankr. D. Idaho 2007) (limiting standing of entity in which debtor owned stock to specific issues and rejecting standing to raise other issues); *In re Orlando Inv., L.P.*, 103 B.R. 593, 596-97 (Bankr. E.D. Pa. 1989) (objectors could not challenge plan releases that only affected other interest holders).

the grounds that it violates the absolute priority rule because this rule applies only to unsecured creditors in Class 4, and not to secured creditors such as IFA.

"The absolute priority rule requires that the holder of an unsecured claim must receive the full amount of its allowed claim unless all junior claims and interests will receive no property and retain no interest under the plan." *Mut. Life Ins. Co. of N.Y. v. Patrician St. Joseph Partners Ltd. P'ship (In re Patrician St. Joseph Partners Ltd. P'ship)*, 169 B.R. 669, 682 (D. Ariz. 1994) (describing the meaning and application of 11 U.S.C. § 1129(b)(2)(B)).

IFA asserts that it holds a second lien on the Property and other assets of the Debtor's estate. [Finding of Fact No. 18.]  The Debtor vigorously disputes that IFA holds any such lien, [Finding of Fact No. 21], but even assuming that IFA's lien is valid, there is no scenario whereby IFA could ever hold an unsecured claim.  Indeed, IFA has stipulated that the Debtor did *not* sign the promissory note held by IFA and that the Debtor has no personal liability to IFA.  [Finding of Fact No. 18.]  Hence, even if IFA's lien on property of the Debtor's estate is valid, and even if IFA foreclosed on this lien and a deficiency resulted, IFA could not look to the Debtor or its estate's remaining assets for payment of this unsecured amount.

Because IFA can never hold an unsecured claim against the Debtor and the Debtor's estate, IFA has no standing to object to the Amended Plan on the grounds that it violates the absolute priority rule.[10]  Such an objection may only be prosecuted by the holder of an unsecured claim.  *Id.*; *see also Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206-07 (1988) (interpreting the absolute priority rule to be applicable to *unsecured* creditors); *Corestates Bank, N.A. v. United Chem. Techs.*,

---

[10] Even if IFA has standing to object on the grounds that the Amended Plan violates the absolute priority rule, the Court finds that the absolute priority rule is not violated or, even if it is, the Court concludes that the "new value exception" applies.  The Court's discussion on these issues is set forth subsequently herein.

*Inc.*, 202 B.R. 33, 54 (E.D. Penn. 1996) ("Courts limit their application of the absolute priority rule to unsecured creditors."); *In re Applied Safety, Inc.*, 200 B.R. 576, 588 (E.D. Penn. 1996) ("The absolute priority rule applies to only unsecured claims.").

**D.      Even if IFA has standing to object to the Amended Plan, IFA has no right to cast a ballot voting against the Amended Plan.**

Federal Rule of Bankruptcy Procedure 3003(c)(2), in pertinent part, states that "any creditor whose claim . . . is . . . scheduled as disputed . . . shall file a proof of claim . . . ; any creditor who fails to do so shall not be treated as a creditor with respect to such claim for the purposes of voting and distribution."

As already discussed above, this Court does not believe that IFA is a "creditor" as that term is defined by § 101(10).   However, to the extent that this Court is incorrect and IFA is a creditor—which would give IFA standing to object to the Amended Plan pursuant to §§ 1109(b) and 1128(b)—IFA still could not cast a ballot voting against the Amended Plan.  The Court draws this conclusion because the Debtor scheduled IFA's claim as disputed, [Findings of Fact Nos. 21 & 47], and IFA has never filed a proof of claim.  [Finding of Fact No. 46.]  Thus, pursuant to Bankruptcy Rule 3003(c)(2), IFA has no right to vote; and even though it completed and submitted a ballot for Class 3 voting against the Amended Plan, [Finding of Fact No. 44], its ballot must be stricken.  *See, e.g., In re Trans Max Techs., Inc.*, 349 B.R. 80, 85 (Bankr. D. Nev. 2006) ("As to the remaining claimants, they did not file proofs of claim and were not listed on Trans Max's schedules. . . . Thus, these claimants may not vote, and they do not have standing to object to the plan.  Their objections are thus overruled."); *In re Dartmoor Homes, Inc.*, 175 B.R. 659, 664 (Bankr. N.D. Ill. 1994) ("If a scheduled creditor does not file a timely proof of claim when it is required to do so, that creditor

is in the worst of all worlds: it cannot participate in plan voting, will receive no distributions under the plan, and will have its claim discharged."); *In re Stuber*, 142 B.R. 435, 441 (Bankr. D. Kan. 1992) ("The penalty for failure to file a claim is the loss of the right to vote on and receive distribution under the plan.").

**E.    Redwood is barred from objecting to the Amended Plan.**

There is no question that Redwood, unlike IFA, is a party-in-interest under 11 U.S.C. §§ 1109(b) and 1128(b).  Redwood is, after all, a 50% owner of the Debtor, [Findings of Fact Nos. 1 & 4]—which means that Redwood comes within one of the seven enumerated categories of § 1109(b): it is an "equity security holder."  Thus, Redwood—at least in the first instance—has standing to object to the Amended Plan.

Redwood has, however, failed to comply with Federal Rule of Bankruptcy Procedure 3020(b)(1), and therefore is barred from objecting to the Amended Plan.  Bankruptcy Rule 3020(b)(1) requires that

> [a]n objection to confirmation of the plan shall be filed and served on the debtor, the trustee, the proponent of the plan, any committee appointed under the Code, and any other entity designated by the court, *within a time fixed by the court*.  Unless the case is a Chapter 9 municipality case, a copy of every objection to confirmation shall be transmitted by the objecting party to the United States Trustee within the time period fixed for filing objections.

(emphasis added).

In the case at bar, Redwood failed to file a written objection to the Amended Plan by the deadline of December 12, 2008 set forth in this Court's order of November 14, 2008.  [Finding of Fact No. 39.]  Thus, Redwood's violation of this Court's order bars Redwood from now objecting to the Amended Plan.

31

If Redwood had filed an untimely objection and shown cause why this objection was late, the Court might have allowed Redwood to prosecute its objection. Redwood, however, has *never* filed a written objection. Rather, Redwood simply sent its counsel to the confirmation hearing, without any witnesses or exhibits, in the hope that its counsel's efforts alone could defeat confirmation of the Amended Plan.

Redwood's trial strategy has failed. To be sure, Redwood, just like IFA, has the right to minimize the time it spends and the fees it incurs when protecting its interests in this case. There is, however, a price to be paid for taking the approach that it did, particularly when this approach includes not filing a timely written objection pursuant to Bankruptcy Rule 3020(b)(1). That price is aptly described in *In re Neff*, 60 B.R. 448 (Bankr. N.D. Tex. 1985), where the SBA, a creditor in Mr. Neff's Chapter 11 case, failed to comply with Bankruptcy Rule 3020(b)(1):

> The Small Business Administration has raised a number of objections to Neff's proposed Plan of Reorganization including improper classification of its secured and unsecured claims in violation of the requirements of Section 1122 of the Code. *The Court finds, however, that the Small Business Administration has no standing to assert these objections.* On November 20, 1984, the Court approved the Amended Disclosure Statement of Neff and fixed December 14, 1984 as the last day for filing and serving objections to confirmation of the Plan pursuant to Rule 3020(b)(1) of the Bankruptcy Rules and also set December 14, 1984 as the last date for filing written acceptances or rejections of the Plan.
>
> The Small Business Administration, however, failed to file a timely acceptance or rejection of the Plan or a timely objection to confirmation prior to December 14, 1984. Therefore, because the Small Business Administration failed to vote, Class 9 (whose sole member is the Small Business Administration) is deemed to have accepted the Plan . . . .

*In re Neff*, 60 B.R. at 457-58 (emphasis added).

*Neff*'s holding applies with equal force in the case at bar. Redwood, like the SBA, falls within one of the enumerated categories of § 1109(b)—Redwood, being an "equity security holder"

32

and the SBA being a "creditor." Thus, both are parties-in-interest with standing to object under 11

U.S.C. § 1128(b). However, Redwood, like the SBA, was required to file a written objection by a

certain deadline (here, by December 12, 2008). Redwood, like the SBA, failed to do so. Therefore,

Redwood, like the SBA, forfeited its standing to object to the Amended Plan.[11]

**F.      Even though neither IFA nor Redwood has standing to object to the Amended Plan, this Court has an independent duty to ensure that the requirements of § 1129 are met.**

That IFA and Redwood have no standing to object to the Amended Plan does not mean that

the Amended Plan should automatically be confirmed. This Court has an independent duty to ensure

that all of the requirements of § 1129 are met. As made clear by the Fifth Circuit over twenty years

ago, this duty extends not only to the requirements of § 1129(a), but also to the elements of §

1129(b):

> A bankruptcy court must hold an evidentiary hearing in ruling on confirmation. At
> this hearing, in addition to the consideration of objections raised by creditors, the
> court has a mandatory independent duty to determine whether the plan has met all of
> the requirements necessary for confirmation. We hold that, pursuant to its mandatory
> independent duty to determine whether the plan complied with § 1129(b)(2)(B)(i),
> the bankruptcy court properly re-examined the valuation of the horses.

*In re Williams*, 850 F.2d 250, 253 (5th Cir. 1988) (internal marks and citations omitted); *In re T-H*

*New Orleans Ltd. P'ship*, 188 B.R. 799, 805 (E.D. La. 1995), *aff'd*, 116 F.3d 790 (5th Cir. 1997) ("A

bankruptcy court confirming a 'cram-down' Chapter 11 reorganization plan has an independent duty

to analyze the debtor's plan to determine that it has met all the requirements of the Code."); *see also*

*In re Save Our Springs (S.O.S.) Alliance, Inc.*, 388 B.R. 202, 222 (Bankr. W.D. Tex. 2008)

---

[11] Another way to describe this result is to say that Redwood waived its right to object. *See, e.g., In re Westbrook*, 246 B.R. 412, 419 (Bankr. N.D. Ala. 1999) ("GMAC had ample opportunity to object to confirmation . . . [and] [t]he Court must conclude that GMAC's actions cumulatively demonstrate an intent to waive the debtor's obligation to pay interest under section 1325(a)(5). GMAC failed to object to confirmation of the debtor's plan [pursuant to Bankruptcy Rule 3015(f), which is the companion rule for Chapter 13 plans to Rule 3020(b) for Chapter 11 plans], after having received full and clear notice of the debtor's intention not to pay interest.").

(acknowledging "the Court's independent duty to determine that all requirements for confirmation are met").

Accordingly, the Court reviews each of these requirements to determine if the Amended Plan should be confirmed.

## G.  The Amended Plan complies with § 1129(a) of the Bankruptcy Code.

The Debtor, as the proponent of the Amended Plan, has the burden of proving that all elements of 11 U.S.C. § 1129(a) are satisfied. *In re Internet Navigator Inc.*, 289 B.R. 128, 131 (Bankr. N.D. Iowa 2003). The Debtor must satisfy its burden of proof as to the Amended Plan's compliance with § 1129(a) by a preponderance of evidence. *In re Briscoe Enters., Ltd. II*, 994 F.2d 1160, 1165 (5th Cir. 1993), *cert. denied*, 510 U.S. 992 (1993). In the case at bar, the Court finds that the Debtor has met its burden of proof and that all applicable elements of § 1129(a) are satisfied. The Court makes these findings based upon the credible and uncontroverted testimony of Morrow and Carter, as well as upon the exhibits introduced by the Debtor.

### 1.  11 U.S.C. §1129(a)(1): The Amended Plan complies with the applicable provisions of Title 11.

The Amended Plan complies with the applicable provisions of the Bankruptcy Code, including the requirements of §§ 1122 and 1123(a) and (b), thereby satisfying § 1129(a)(1).

The Amended Plan properly classifies claims and interests in accordance with 11 U.S.C. §§ 1122 and 1123(a)(1). Class 1 consists solely of Regions's secured claim. [Finding of Fact No. 47.] Class 2 consists solely of Wallis's secured claim. [Finding of Fact No. 47.] Class 3 consists solely of the disputed secured claim of IFA. [Finding of Fact No. 47.] Class 4 is comprised of all allowed unsecured claims. [Finding of Fact No. 47.] And Class 5 consists of the partnership interests in the

34

Debtor held by Redwood and Morrow.[12] [Finding of Fact No. 47.]  The claims and interests placed in each class are substantially similar to other claims and interests in each such class.  Valid business, factual, and legal reasons exist for separately classifying the various classes of claims and interests created under the Amended Plan, and such classes, and the Amended Plan's treatment thereof, do not unfairly discriminate between holders of claims or interests in each class.  The Amended Plan also provides for the same treatment by the Debtor of each claim or interest in each respective class, thereby satisfying 11 U.S.C. § 1123(a)(4).  *See, e.g., In re U.S. Brass Corp.*, 169 F.3d 957, 958 (5th Cir. 1999) ("11 U.S.C. § 1123(a)(4) . . . requires all creditors within a class be treated the same, unless the creditor who is being treated less favorably agrees to less favorable treatment.").  Thus, the Amended Plan satisfies 11 U.S.C. §§ 1122 and 1123(a).

Further, pursuant to 11 U.S.C. § 1123(b), the Amended Plan properly preserves the Debtor's ability to prosecute the Adversary Proceeding.  *See In re Tex. Gen. Petroleum Corp.*, 52 F.3d 1330, 1335 n.4 (5th Cir. 1995) (explaining that a debtor may retain post-confirmation causes of action if the plan so provides).  However, to the extent that the Amended Plan makes a blanket reservation of causes of action that may be pursued by the Debtor, these generic causes of action may not be preserved.  *See Dynasty Oil & Gas, LLC v. Citizens Bank (In re United Operating, LLC)*, 540 F.3d 351, 355-56 (5th Cir. 2008) (holding that a debtor must make a "specific and unequivocal" reservation of claims that would effectively "put its creditors on notice of any claim it wishes to pursue after confirmation").  Thus, in this particular respect, the Amended Plan does not comply with applicable law and must be modified to delete any reference that the reorganized Debtor reserves the

---

[12] The Amended Plan defines Class 5 as a class of "equity security holders," which consists of "the Record Holders of Ownership Interests in the Debtor."  Here, the ownership interests are in the form of partnership interests owned 50% by Morrow and 50% by Redwood, respectively.

right to prosecute unspecified causes of action. This Court, *sua sponte*, modifies the Amended Plan to delete this provision.[13]

The Amended Plan also runs afoul of another provision in Title 11. Paragraph 11.3 of the Amended Plan sets forth that upon confirmation, the Debtor will receive a discharge. 11 U.S.C. § 1141(d)(3) expressly provides that "the confirmation of a plan does not discharge the debtor if (A) the plan provides for the liquidation of all or substantially all of the property of the estate; (B) the debtor does not engage in business after consummation of the plan; and (C) the debtor would be denied a discharge under section 727(a)." 11 U.S.C. § 1141(d)(3). There is no question that the Amended Plan provides for liquidation of all the Debtor's assets. [Finding of Fact No. 37.] Additionally, the Debtor will not continue its real-estate business post confirmation; the only action that the Debtor will undertake post-confirmation is the prosecution of the Adversary Proceeding. Finally, the Debtor would be denied a discharge under § 727(a) because it is not an individual. 11 U.S.C. § 727(a)(1) (mandating that a debtor who is "not an individual" be denied a discharge under Chapter 7). Therefore, the Debtor must be denied a discharge pursuant to § 1141(d)(1); and therefore, this Court, *sua sponte*, modifies the Amended Plan to delete paragraph 11.3.

In sum, the Amended Plan, as modified to delete the provisions containing a blanket reservation of unspecified causes of action and the granting of a discharge, provides adequate and proper means for its implementation, and also complies with applicable provisions of Title 11. Therefore, the Court concludes that § 1129(a)(1) is satisfied.

---

[13] The Court has the discretion to, *sua sponte*, strike provisions of the Amended Plan that do not comply with the confirmation requirements of 11 U.S.C. § 1129. The Fifth Circuit and certain district courts have upheld the confirmation of plans that were modified by the bankruptcy court in the confirmation order. *See, e.g., Drive Fin. Servs. L.P. v. Jordan*, 521 F.3d 343, 345 (5th Cir. 2008) (upholding a bankruptcy court's plan confirmation where the court modified interest rates payable to certain creditors in the confirmation order); *United States v. GWI PCS 1, Inc.*, 245 B.R. 59, 64-65 (N.D. Tex. 1999) (upholding a bankruptcy court's modification of a plan in its confirmation order).

**2.      11 U.S.C. § 1129(a)(2): The proponent of the Amended Plan has complied with the applicable provisions of Title 11.**

Section 1129(a)(2) requires that "the proponent of the plan complies with the applicable provisions of [Title 11]." Though this language is broad, the Bankruptcy Court for the Western District of Texas has reasoned that § 1129(a)(2) does not provide creditors with a "silver bullet" to defeat confirmation based on each and every minor infraction of Title 11 that a debtor may commit:

> Contrary to Bank United's interpretation of § 1129(a), Congress did not intend to fashion a minefield out of the provisions of the Bankruptcy Code. In fact, the legislative history mentions the provision only in passing, offering as an example of compliance that the debtor meet the disclosure requirements of § 1125 to satisfy § 1129(a)(2). Certainly, if Congress had meant that any infraction, no matter how early on in the case, no matter how minor the breach, and regardless of whether the court has remedied the violations, should result in a denial of confirmation, Congress would have given some clearer indication in the legislative history or made the statutory provision far more express.

*In re Landing Assocs., Ltd.*, 157 B.R. 791, 811 (Bankr. W.D. Tex. 1993); *see also In re Heritage Organization*, L.L.C., 375 B.R. 230, 309 (Bankr. N.D. Tex. 2007) (holding that the debtor's negotiations with a creditor to include certain modifications in the plan in exchange for acceptance did not preclude confirmation under § 1129(a)(2)). Bankruptcy courts limit their inquiry under § 1129(a)(2) to ensuring that the plan proponent has complied with the solicitation and disclosure requirements of § 1125. *See, e.g., In re Apex Oil Co.*, 118 B.R. 683, 703 (Bankr. E.D. Mo. 1990) (determining that "the principal purpose of [§ 1129(a)(2)] is to assure that the plan proponent has complied with the disclosure requirements enumerated in 11 U.S.C. § 1125 in connection with the solicitation of acceptances to the plan"); *In re Texaco, Inc.*, 84 B.R. 893, 906-07 (Bankr. S.D.N.Y. 1988) ("The principal purpose of Section 1129(a)(2) is to assure that the proponents have complied with the requirements of section 1125 in the solicitation of acceptances to the plan."); 5 Collier on

Bankruptcy, ¶ 1129.02 (15th ed. rev. 1989).

In the case at bar, the Court need not determine whether § 1129(a)(2) requires more than what is set forth in § 1125 because no evidence has been adduced, nor has it been argued that the Debtor has violated any applicable provision of the Bankruptcy Code.  Therefore, the Court only need address the Debtor's compliance with § 1125 in making its disclosures and solicitations.

The Debtor's Amended Disclosure Statement contains "adequate information" as that term is defined in § 1125(a).  The Court approved the Debtor's Amended Disclosure Statement as containing adequate information at the confirmation hearing, specifically finding that the Amended Disclosure Statement met the *Metrocraft* standard.  *See Metrocraft Pub. Servs., Inc.*, 39 B.R. 567 (Bankr. N.D. Ga. 1984).

Additionally, the Debtor has complied with § 1125(b) because Class 1 and Class 2's acceptances of the Amended Plan were not obtained prior to the filing of this case or prior to the Debtor's filing of the Amended Disclosure Statement.  They were, however, obtained prior to this Court's actual approval of the Amended Disclosure Statement, which occurred on December 19, 2008 (i.e. at the joint hearing on approval of the Amended Disclosure Statement and the Amended Plan).  Although typically a disclosure statement should be approved before the proponent solicits votes for the plan, here the premature solicitation was harmless and, as noted by the Bankruptcy Court for the Northern District of Georgia, a harmless failure to comply with § 1125's solicitation requirements "is not necessarily fatal to the success of a Chapter 11 reorganization."  *In re N.W. Recreational Activities, Inc.*, 8 B.R. 10, 12 (Bankr. D. Ga. 1980); *see also First Am. Bank of N.Y. v. Century Glove, Inc.*, 81 B.R. 274, 278-80 (D. Del. 1988) (holding that a plan proponent's failure to obtain court approval of solicitation materials is not *per se* fatal to the confirmation process).

Pursuant to 11 U.S.C. § 105(d)(2)(B)(vi), this Court scheduled a simultaneous hearing on the Amended Disclosure Statement and the Amended Plan for reasons of judicial efficiency and economy. [Docket No. 174.] Therefore, the Court's approval of the Amended Disclosure Statement at the confirmation hearing instead of at a prior separate hearing does not preclude confirmation under § 1129(a)(2).

For these reasons, post-petition disclosure and solicitation were conducted in compliance with 11 U.S.C. § 1125, and the requirements of 11 U.S.C. § 1129(a)(2) are therefore met.

### 3. 11 U.S.C. § 1129(a)(3): The Amended Plan was proposed in good faith and not by any means prohibited by law.

Section 1129(a)(3) requires that the Amended Plan be proposed in good faith and not by any means forbidden by law. For this requirement to be satisfied, the Fifth Circuit has held that the Amended Plan must be proposed with the legitimate and honest purpose to reorganize and have a reasonable hope of success. *In re Sun Country Dev., Inc.*, 764 F.2d 406, 408 (5th Cir. 1985). Moreover, "to be proposed in good faith, a plan must fairly achieve a result consistent with the [Bankruptcy] Code." *In re Block Shim Dev. Company-Irving*, 939 F.2d 289, 292 (5th Cir. 1991). Finally, whether the Amended Plan in the case at bar is proposed in good faith is a question of fact that must be determined in light of the totality of the circumstances surrounding the bankruptcy filing. *Pub. Fin. Corp. v. Freeman*, 712 F.2d 219, 221 (5th Cir. 1983).

In the case at bar, the facts strongly support a conclusion that the Amended Plan is proposed in good faith. Morrow testified that the Purchaser, in which he holds a 50% ownership interest [Findings of Fact Nos. 1 & 2], is buying the Property from the Debtor in order to maximize the Debtor's bankruptcy estate for the benefit of its creditors. [Finding of Fact No. 55.] Morrow's

testimony is corroborated by Carter's testimony that no other buyer could be found for the Property[14] and that the Purchaser is willing to pay consideration that is several hundred thousand dollars above the current fair market value of the Property.[15]  [Finding of Fact No. 54.]  Indeed, no evidence has been offered to the contrary.  As a result of the Purchaser buying the Property, the secured claims of Regions and Wallis will be assumed and will likely be paid—treatment which Regions and Wallis accept—all tax claims will immediately be paid in full, all administrative claims will immediately be paid in full, and, depending upon the outcome of the Adversary Proceeding, unsecured claims may soon be paid in part, if not in whole.[16]  As payment of claims is one of the twin pillars of bankruptcy, *In re T-H New Orleans Ltd. Partnership*, 116 F.3d 790, 807 (5th Cir.1997), this result underscores that the Amended Plan is proposed in good faith.[17]   *See In re Block Shim Dev. Co.-Irving*, 939 F.2d at 292.  Therefore, the Court concludes that the requirements of 11 U.S.C. § 1129(a)(3) are satisfied.

At the confirmation hearing, IFA suggested that the Purchaser was obtaining title to the Property at a discount because the consideration being given by the Purchaser was less than the value

---

[14] Indeed, even when YHI removed any listed sales price and simply sought offers at any amount, no one submitted an offer.  [Finding of Fact No. 12.]

[15] One likely reason why Morrow, through the Purchaser, may be offering to pay consideration over and above the current fair market value of the Property is that if the Property is not purchased, then Regions and Wallis will foreclose their liens and sue Morrow, personally, for any deficiency.  Such a suit would assuredly not be helpful to Morrow's financial reputation and could undermine any other existing business transactions or prospective business opportunities that he may presently be undertaking or considering.

[16] The trial in the Adversary Proceeding is scheduled to be held in April of 2009.  [Finding of Fact No. 27.]  One key issue to be determined is whether IFA has a valid lien.  If it does not, then, as noted *supra* note 6, the Debtor's existing cash of $14,000.00, plus the Debtor's existing receivables, plus any monies recovered from prosecution of the Adversary Proceeding, will be used to pay unsecured claims.

[17] The other primary purpose of the Bankruptcy Code is to allow a debtor to obtain a fresh start by being granted a discharge.  *In re T-H New Orleans Ltd. P'ship*, 188 B.R. at 807.  However, this aim is not achievable in this case because the Debtor has proposed a liquidating plan.

of the Property set forth in the Debtor's schedules—i.e. $10,361,675.00. Implicit in this argument is that the Amended Plan could not be proposed in good faith. The Court disagrees. IFA's argument that the Debtor is estopped from transferring the Property for less than the value set forth in the Schedules is legally unavailing. Numerous courts have held that the doctrine of judicial estoppel has "no relevance and applicability to valuation of property in a case under Title 11." *In re Victorian Park Assocs.*, 189 B.R. 147, 150 (Bankr. N.D. Ill. 1995); *In re Kelley*, 163 B.R. 27, 34 (Bankr. E.D.N.Y. 1993); *In re Woolley's Parkway Ctr., Inc.*, 147 B.R. 996, 1001 (Bankr. M.D. Fla. 1992). Indeed, "[t]he argument that the valuation at the beginning of a case is cast in concrete and is the law of the case for all purposes not only defies logic but is clearly contrary to the specific language of § 506 of the Code." *JE Livestock, Inc.*, 375 B.R. at 925 (internal marks omitted); *see also Williams v. Hibernia Nat'l Bank (In re Williams)*, 850 F.2d 250, 253 (5th Cir. 1988) (holding that even though the bankruptcy court, earlier in the case, had found that horses owned by the debtor had a value of $134,300.00, at the confirmation hearing, in evaluating the Chapter 11 plan of reorganization, "the bankruptcy court *properly re-examined the valuation of the horses*" and found that the value had decreased due to the fact that "*the market was depressed and that it would take at least one year to sell the horses*" (emphasis added)).

In the case at bar, Carter very credibly testified that the recent severe economic downturn has led to a reduction in value of the Property. [Finding of Fact No. 48.] At the time that the Debtor filed its original Schedules (scheduling the Property to have a value of $10,361,675.00)—i.e. on July 20, 2007, [Finding of Fact No. 10]—the economic downturn had not yet occurred. Approximately one and one-half years later, at the confirmation hearing held on December 19, 2008, a severe economic downturn had occurred throughout the country. Under these circumstances, pursuant to

41

the Fifth Circuit's instruction in *Williams*, this Court has a duty to examine the value of the Property

on the date of the confirmation hearing in assessing, among other factors, whether the Amended Plan

is filed in good faith. Here, Carter testified that the value of the Property will, because of the severe

downturn in the economy and tightened capital markets, continue to decline from the present value

of $6.00/7.00 per square foot (i.e. $5.9 million to $6.9 million) to approximately $4.00 per square

foot  (i.e. $3.9 million).  [Finding of Fact No. 48.]  This testimony underscores the practical point

articulated by the Fifth Circuit in *Williams*: namely, that values of assets fluctuate during the

pendency of a bankruptcy case and that, therefore, the bankruptcy courts should evaluate values at

the time of the confirmation hearing and not simply accept the values set forth in the Schedules that

were filed at the outset of the case or rely on values found by the Court at hearings held well before

the confirmation hearing.

### 4.     11 U.S.C. § 1129(a)(4): All payments for services or costs in connection with the Debtor's Chapter 11 case are subject to Court approval.

Section 1129(a)(4) requires that any payment made or promised by the proponent under the

plan for services, costs, or expenses in connection with the Chapter 11 case be disclosed to the Court.

*See In re Cajun Elec. Power Co-op., Inc.*, 150 F.3d 503, 514-15 (5th Cir. 1998) (concluding that §

1129(a)(4) is designed to assure that payments for professional services connected with the debtor's

Chapter 11 case will be subject to the bankruptcy court's approval and determination of

reasonableness).  Here, paragraph 2.1 of the Amended Plan provides that professionals whose

retention has been approved by the bankruptcy court "shall be required to file with the Bankruptcy

Court a final fee application within sixty (60) days after receiving notice of the effective date" and

that such fee claims "shall become an Administrative Claim only to the extent allowed by Final

Order." [Docket No. 165.]  Under these circumstances, the Court concludes that § 1129(a)(4) is satisfied.

5.     **11 U.S.C. § 1129(a)(5): The Amended Plan discloses the identity and the nature of compensation of insiders proposed to serve the reorganized Debtor, and such individuals' continuance in office is consistent with the interests of creditors and public policy.**

The Debtor has complied with § 1129(a)(5) of the Bankruptcy Code.  Specifically, the Debtor has complied with § 1129(a)(5)(i) by disclosing in the Amended Plan, in the Amended Disclosure Statement, and at the confirmation hearing the identity and affiliations of Morrow, who is proposed to serve, after confirmation of the Amended Plan, as the managing venturer of the reorganized Debtor. [Finding of Fact No. 51]; *see also, e.g.*, *In re Entergy New Orleans, Inc.*, No. 05-17697, 2007 WL 1343804, at *4 (Bankr. E.D. La. May 7, 2007) (finding that a plan satisfied § 1129(a)(5) where the debtor disclosed the identity of any insider who would be retained by the reorganized debtor and the nature of any compensation received by such insider).

Bankruptcy courts have recognized that keeping a competent officer in charge of the reorganized debtor is consistent with public policy under § 1129(a)(5)(ii).  *See, e.g.*, *In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141, 150 (Bankr. S.D.N.Y. 1984) (finding that keeping the founder and president of the debtor in charge satisfied § 1129(a)(5) where creditors did not present evidence as to the inadequacy of current management).  In this case, there is no question that Morrow brings a level of competence to the reorganized Debtor because Morrow has the most extensive background and knowledge about the circumstances that caused him, as managing venturer of the Debtor, to file the Adversary Proceeding.  It is important that Morrow continue to manage the reorganized Debtor because whether unsecured claims are paid will primarily be determined by whether the reorganized

43

Debtor prevails in the Adversary Proceeding—or at least settles this suit on terms that produce unencumbered cash for distribution to unsecured claimants. Because Morrow has the most knowledge about the issues relating to the Adversary Proceeding, he will be most effective at gauging whether any settlement offer should be accepted or whether the Debtor should proceed to trial.

Finally, in addition to the Amended Plan setting forth that Morrow will serve as the managing venturer of the reorganized Debtor, the Amended Plan also discloses that Morrow and his wife own the Purchaser. Accordingly, Morrow has ensured that there is the utmost complete disclosure, not only with respect to his serving as managing venturer of the reorganized Debtor, but also with regard to his family-owned entity being the Purchaser of the Property under the Amended Plan.

For all of these reasons, the Amended Plan's retention of Morrow as managing venturer of the reorganized Debtor is consistent with the interests of creditors and public policy. Therefore, this Court concludes that the Amended Plan satisfies § 1129(a)(5).

**6.     11 U.S.C. § 1129(a)(6): Section 1129(a)(6) is inapplicable.**

The Debtor's rates are not set by any government regulatory commission. Therefore § 1129(a)(6) is inapplicable.

**7.     11 U.S.C. § 1129(a)(7): The Amended Plan satisfies the "best interests" test with regards to holders of claims and interests in impaired classes because creditors with claims in impaired classes have either accepted the Amended Plan, or will receive property of a value not less than the amount they would receive in a Chapter 7 liquidation.**

Under § 1129(a)(7), all holders of claims and interests in impaired classes must either vote to accept the Amended Plan or receive the same or more under the Amended Plan than they would in a Chapter 7 liquidation. This provision is known as the "best-interest-of-creditors-test" because

44

it ensures that reorganization is in the best interest of individual claimholders who have not voted in favor of the plan. *See Bank of Am. Nat. Trust & Sav. Assoc. v. 203 N. LaSalle Street P'ship*, 526 U.S. 434, 441 n.13 (1999). It is important to note that the Amended Plan is a liquidating plan because it provides for the liquidation of all assets of the Debtor's bankruptcy estate. [Finding of Fact No. 37.] For this reason, except for treatment that defies the priority hierarchy, claimholders in a liquidating plan typically receive what they would if the Debtor were to liquidate under Chapter 7. *See, e.g.*, *In re Hendrick*, 45 B.R. 976, 987 (Bankr. M.D. La. 1985) (holding that a liquidating plan that followed Chapter 7 satisfied § 1129(a)(7)). Further, liquidating plans may be more cost effective than liquidation under Chapter 7 because liquidating plans "provide[] for the expeditious payment of available proceeds of the [e]state to [a]llowed [c]laims and [e]quity [i]nterests, without the need for the delay and expense occasioned by the appointment of a Chapter 7 trustee." *In re WRN 1301, Inc.*, No. 06-41381, 2007 WL 1555812, at *6 (Bankr. E.D. Tex. May 24, 2007).

Under the Amended Plan, all classes are impaired. [Finding of Fact No. 47.] Classes 1 and 2 have accepted the Amended Plan such that § 1129(a)(7) is satisfied as to those classes. [Findings of Fact Nos. 42 & 43.] Section 1129(a)(7) is also satisfied as to Classes 3 and 4, which are deemed to have accepted the Amended Plan as discussed *infra*, section IV(G)(8). However, even if Classes 3 and 4 are not deemed to have accepted, the claimholders in those classes will receive as much under the Amended Plan as they would under Chapter 7 because the Amended Plan provides for liquidation of *all* of the Debtor's assets.

According to the liquidation analysis filed by the Debtor, IFA, whose disputed second lien comprises Class 3, would receive nothing in a Chapter 7 liquidation. On the other hand, Regions stipulated that if the Amended Plan is confirmed, Regions would release its lien on the available cash

of $14,000.00 and the Debtor's remaining receivables. [Finding of Fact No. 56.] If Regions's lien is released, IFA's junior lien—assuming that it is valid—becomes a senior lien on these two categories of assets. Hence, unlike a Chapter 7, where Regions's lien would remain in place, thereby depriving IFA of being able to foreclose its junior lien on cash and receivables, confirmation of the Amended Plan provides IFA the opportunity to take all of the cash and receivables. It must simply obtain a judgment in the Adversary Proceeding that its lien is valid. Under these circumstances, IFA will not only receive as much under the Amended Plan as it would under Chapter 7; IFA might well receive more under the Amended Plan.[18]

The Debtor's liquidation analysis also shows that if this case is converted to Chapter 7, unsecured claimants in Class 4 will not receive any distribution; whereas, if the Amended Plan is confirmed, unsecured claimants might be paid in full, or at least in part—depending upon the outcome of the Adversary Proceeding. The key here is that if the Amended Plan is confirmed, the Purchaser will fund the suit brought by the Debtor against IFA and the other defendants in the Adversary Proceeding; whereas, if the case is converted, no such funding would be provided, thereby leaving the Chapter 7 trustee with no, or very minimal, funds to retain counsel and prosecute the claims—a circumstance which would make it difficult for the trustee to liquidate this suit and generate funds to pay unsecured claims. Moreover, if the Amended Plan is confirmed, then the reorganized Debtor will prosecute the Adversary Proceeding and IFA's alleged lien might be declared to be invalid—thereby freeing up the cash and receivables, when collected, for distribution

---

[18] IFA's lien on the Property is extinguished regardless of whether the Amended Plan is confirmed or the case is converted to a Chapter 7 because under the former, the Purchaser is buying the Property free and clear of IFA's alleged second lien; and under the latter, Regions and Wallis would inevitably obtain a lifting of the automatic stay and proceed to foreclosure—and either purchase the Property themselves or sell the Property to the Purchaser, who, as now, would probably be the only third party to bring any cold, hard cash to the foreclosure sale.

entirely to Class 4 unsecured creditors.  Accordingly, the Court concludes that if the Amended Plan is confirmed, the unsecured claimants will certainly receive as much as they would if this case were converted to Chapter 7, and they will have a greater chance of receiving more than they would if the case were in a Chapter 7.

Finally, even though the partnership interest holders whose claims comprise Class 5 (i.e. Redwood and Morrow) are slated to receive nothing under the Amended Plan, based on the liquidation analysis provided by the Debtor—which has not been disputed and which this Court finds to be adequate for the purposes of analysis under § 1129(a)(7)—liquidation of all the Debtor's assets under Chapter 7 would not provide the two partners with more favorable treatment than they receive under the Amended Plan.  That is, in a Chapter 7 liquidation, the holders of the partnership interests would receive nothing, just as they are receiving nothing pursuant to the Amended Plan.

For the reasons set forth above, the Amended Plan satisfies § 1129(a)(7) of the Bankruptcy Code because each holder of a claim in an impaired class has either accepted the Amended Plan or is receiving property of a value that is not less than the amount such holder would receive in a Chapter 7 liquidation.

**8.      11 U.S.C. § 1129(a)(8): Each class of claims and interests has either accepted the Amended Plan or are subject to the cramdown provisions of 11 U.S.C. § 1129(b).**

Section 1129(a)(8) is satisfied with respect to the claims in Classes 1 and 2 because these impaired classes have voted to accept the Amended Plan.  [Findings of Fact Nos. 42 & 43.]  The Court also concludes that Section 1129(a)(8) is satisfied with respect to the claims in Classes 3 and 4 because, although these classes are impaired, they are deemed to have accepted the Amended Plan because neither Class 3 nor Class 4 has submitted a valid ballot or lodged a valid objection.  *In re*

*Ruti-Sweetwater, Inc.*, 836 F.2d 1263, 1266-67 (10th Cir.1988) (holding that a creditor's failure to vote or to object to a Chapter 11 plan constitutes acceptance of the plan).   The Court acknowledges that some bankruptcy courts have disagreed with the Tenth Circuit's reasoning in *Sweetwater*.  *See In re Friese*, 103 B.R. 90 (Bankr. S.D.N.Y. 1989) (Brozman, J.); *Bell Rd. Inv. Co. v. M. Long Arabians (In re M. Long Arabians)*, 103 B.R. 211, 215 (B.A.P. 9th Cir. 1989); *In re Higgins Slacks Co.*, 178 B.R. 853. 856 (Bankr. N.D. Ala. 1995).   However, with respect to Class 4 (i.e. unsecured claims), this Court concludes that under the present circumstances—where not one of the unsecured claimants cast a ballot, filed an objection, or even made an appearance in the courtroom—*Sweetwater*'s reasoning is particularly compelling.   The Bankruptcy Court for the Southern District of New York recently offered the following reasoning in support of *Sweetwater*, which rings especially true in this case:

> Regarding non-voters as rejecters runs contrary to the Code's fundamental principle, and the language of section 1126(c), that only those actually voting be counted in determining whether a class has met the requirements, in number and amount, for acceptance or rejection of a plan, and subjects those who care about the case to burdens (or worse) *based on the inaction and disinterest of others*.

*In re Adelphia Comm. Corp.*, 368 B.R. 140, 261-62 (Bankr. S.D.N.Y. 2007) (emphasis added).

*Sweetwater*'s reasoning is also applicable to Class 3, which is comprised of IFA's disputed junior lien. A non-creditor third party (like IFA) that chose not to file a proof of claim, did not cast a ballot, and lacks standing to object, should not be allowed to throw a wrench in the confirmation process. IFA's filing of a written objection to the Amended Plan does not change this result because, as discussed *supra* section IV(B), IFA's lack of standing to object to the Amended Plan renders Class 3's objection invalid.   Nevertheless, even if IFA has standing to object and its class is not deemed to have accepted, the Court is also satisfied that the Amended Plan complies with the cramdown

requirements of § 1129(b), as discussed below, *infra* section IV(H).

Finally, because the Amended Plan provides that "[h]olders of Class [5] Interests will have their stock or other securities canceled and will receive nothing under the Plan," Class 5 is deemed to have rejected the Amended Plan. 11 U.S.C. § 1126(g) ("[A] class is deemed not to have accepted a plan if such plan provides that the claims or interests of such class do not entitle the holders of such claims or interests to receive or retain any property under the plan on account of such claims or interests."); *see also Salsberg v. Trico Marine Servs., Inc. (In re Trico Marine Servs., Inc.)*, 337 B.R. 811, 813 n.2 (Bankr. S.D.N.Y. 2006) (determining that a class of shareholders that were to receive nothing under the plan were deemed to have rejected it); *In re Rail King, Inc.*, 33 B.R. 4, 5 (Bankr. N.D. Ohio 1983) ("Class Five is deemed to have rejected the plan due to the fact that the shareholders in that class are to receive nothing under the Plan."). Accordingly, because an impaired class (i.e. Class 5)[19] is deemed to have rejected the Amended Plan, the Amended Plan may only be confirmed if the provisions of 11 U.S.C. § 1129(b) are satisfied as to Class 5.

For the reasons set forth above, § 1129(a)(8) is satisfied as to all classes other than Class 5. As such, the Debtor has the burden to satisfy the elements under § 1129(b) with respect to Class 5. *See In re Greystone III Joint Venture*, 995 F.2d 1274, 1277 (5th Cir. 1991) (explaining that a plan may be confirmed over the objection by one or more impaired classes if it fulfills the requirements of § 1129(b)).

---

[19] The Court concludes that Class 5, comprising the partnership interests held by Redwood and Morrow, is impaired because the Amended Plan does not leave the legal, equitable, and contractual rights of these two interest holders unaltered. 11 U.S.C. § 1124.

9.     **11 U.S.C. § 1129(a)(9): The Amended Plan provides that holders of administrative expense claims under 11 U.S.C. § 507(a) will receive the allowed amount of such claims in a proper manner and over a proper period.**

The treatment of administrative expense claims under the Amended Plan satisfies the requirements of § 1129(a)(9) of the Bankruptcy Code. Specifically, section 2.1 of the Amended Plan provides that each holder of an administrative claim that becomes allowed shall receive the allowed amount of such claim, in accordance with the requirements of § 1129(a)(9).

Section 1129(a)(9)(A) requires that administrative claims held by the Debtor's counsel under 11 U.S.C. § 507(a)(2), § 503(b)(2), and § 330(a) must be paid in full on the effective date of the plan, unless Debtor's counsel "has agreed to different treatment of such claim[s]." 11 U.S.C. § 1129(a)(9)(A). In the case at bar, because the Amended Plan provides that the Purchaser will pay all administrative claims "in one cash payment as soon as practicable after the [e]ffective [d]ate," [Docket No. 165], the Amended Plan's treatment of administrative claims complies with § 1129(a)(9)(A).

Additionally, the Amended Plan complies with § 1129(a)(9)(A) because the Amended Plan provides that holders of administrative tax claims against the debtor "shall be paid the Allowed Amount of such Holder's Claim in cash, in full, by the Purchaser within five (5) Business Days after the Effective Date, and in the case of real property for the 2008 tax year, by January 15, 2009." [Docket No. 165.] The Amended Plan also provides that the holders of priority tax claims "shall be paid by the Purchaser in accordance with Section 1129(a)," [Docket No. 165], which satisfies the requirements of § 1129(a)(9)(A).

Therefore, the Amended Plan's treatment of administrative expense claims complies with § 1129(a)(9).

10.     **11 U.S.C. § 1129(a)(10): At least one class of impaired creditors accepted the Amended Plan.**

At least one impaired class of claims has accepted the Amended Plan such that the Amended Plan satisfies § 1129(a)(10) of the Bankruptcy Code. Specifically, Classes 1 and 2, comprised of the secured claims held by Regions and Wallis, respectively, are impaired and voted to accept the Amended Plan. [Findings of Fact Nos. 42 & 43.] Because these two impaired classes have voted in favor of the Amended Plan, § 1129(a)(10) is satisfied.

11.     **11 U.S.C. § 1129(a)(11): Confirmation of the Amended Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor.**

Section § 1129(a)(11) requires that a plan be feasible. Specifically, § 1129(a)(11) provides that the court shall confirm a plan only if "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, *unless such liquidation or reorganization is proposed in the plan.*" (emphasis added). Some courts interpret this language to mean that a plan that provides for liquidation automatically satisfies § 1129(a)(11). *See In re 47th and Belleview Partners*, 95 B.R. 117, 120 (Bankr. W.D. Mo.1988); *In re Pero Bros. Farms, Inc.*, 90 B.R. 562, 563 (Bankr. S.D. Fla.1988). Other courts inquire whether the liquidation proposed in the plan is feasible. *See Holmes v. United States (In re Holmes)*, 301 B.R. 911, 914 (Bankr. M.D. Ga. 2003). Here, the Amended Plan satisfies § 1129(a)(11) under either approach.

The Debtor's only major asset is the Property that will be sold to the Purchaser pursuant to the Amended Plan. The testimony of Morrow at the confirmation hearing was clear, credible, and unequivocal; the Purchaser will take title to the Property in exchange for the following consideration:

51

(1) the Purchaser will assume the Debtor's obligations under the loan documents with Regions and Wallis (i.e. approximately $6.2 million of claims owed by the Debtor); (2) the Purchaser will pay all allowed tax claims owing on the Property (i.e. approximately $700,000.00); (3) the Purchaser will pay all allowed administrative claims against the Debtor (i.e. approximately $300,000.00); (4) Morrow will surrender his administrative claim against the estate (i.e. Morrow's claims arising from his personal payment of approximately $700,000.00 of various claims against the estate); and (5) the Purchaser will fund the reorganized Debtor's litigation of the Adversary Proceeding.[20]

Neither IFA nor Redwood adduced any testimony suggesting that the sale contemplated by the Amended Plan will not occur. Indeed, this is highly unlikely given that Morrow owns 50% of, and is empowered to manage, the Purchaser. Based upon the credible testimony that this Court heard from Morrow, the Court finds it to be highly likely that the Purchaser, which is assuming the Debtor's obligations with respect to Regions and Wallis, will be able to pay the claims and fund the Adversary Proceeding as set forth in the Amended Plan.[21] [Finding of Fact No. 51.]

In determining whether a debtor's Chapter 11 plan is feasible "the [bankruptcy] court need not require a guarantee of success . . ., [o]nly a reasonable assurance of commercial viability is required." *In re Briscoe Enters., Ltd., II*, 994 F.2d 1160, 1165-66 (5th Cir. 1993); *see also Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988). All the Court must find is that the Amended Plan offers "a reasonable probability of success." *In re Landing Assoc., Ltd.*, 157 B.R. 791, 820 (Bankr. W.D. Tex. 1993). Here, based upon the credible testimony of Morrow, the Court finds that

---

[20] The Court, *sua sponte*, has ordered that the Purchaser contribute at least $25,000.00 to fund the prosecution of this lawsuit.

[21] If the Purchaser does not make these payments directly, but rather remits the funds to the reorganized Debtor, then this Court concludes that there is a reasonable likelihood that the Debtor will pay the claims as set forth in the Amended Plan.

there is a reasonable likelihood that the Amended Plan will be successfully effectuated because the asset sale will move forward and the Purchaser has the financial strength to: (1) assume the financial obligations of the Debtor with respect to Regions and Wallis; (2) pay all the Debtor's administrative claims and tax claims; and (3) fund the reorganized Debtor's prosecution of the claims asserted in the Adversary Proceeding.  Indeed, the fact that Morrow has already come out of pocket during the pendency of this case to pay taxes of approximately $700,000.00 underscores that he has the financial wherewithal to infuse funds into the Purchaser to effectuate the sale of the Property from the reorganized Debtor to the Purchaser. [Finding of Fact No. 51.]  Therefore, the Court concludes that the requirements of 11 U.S.C. § 1129(a)(11) are met.

12.     **11 U.S.C. § 1129(a)(12): All fees payable under 28 U.S.C. § 1930 have been paid or the Amended Plan provides for payment of all such fees on the effective date of the Amended Plan.**

Morrow testified that all fees payable under 28 U.S.C. § 1930 have been paid or will be paid when due, pursuant to the Amended Plan. The requirements of 11 U.S.C. § 1129(a)(12) are therefore satisfied.

13.     **11 U.S.C. § 1129(a)(13): Section 1129(a)(13) is inapplicable.**

The Debtor has no obligation to pay "retiree benefits."  Therefore, § 1129(a)(13) of the Bankruptcy Code is inapplicable.

14.     **11 U.S.C. § 1129(a)(14): Section 1129(a)(14) is inapplicable.**

The Debtor is not currently required by a judicial or administrative order, or by statute, to pay a domestic support obligation.  Nor could the Debtor be required to pay such support, as it is not a "spouse."  Therefore, § 1129(a)(14) of the Bankruptcy Code is inapplicable.

15.     **11 U.S.C. § 1129(a)(15): Section 1129(a)(15) is inapplicable.**

The Debtor is not an individual and § 1129(a)(15) of the Bankruptcy Code is therefore inapplicable.

16.     **11 U.S.C. § 1129(a)(16): Section 1129(a)(16) is inapplicable.**

Section 1129(a)(16) requires that all transfers of property by a "corporation or trust that is not a moneyed, business or commercial corporation or trust" be made in accordance with applicable provisions of nonbankruptcy law.  Here, the Debtor is a for-profit entity, so § 1129(a)(16) is inapplicable.

**H.     The Amended Plan complies with § 1129(b) of the Bankruptcy Code.**

Notwithstanding that Class 5, an impaired class of partnership interest holders, has not accepted the Amended Plan, the Amended Plan satisfies the applicable requirements of 11 U.S.C. § 1129(b) as to Class 5, and should therefore be confirmed.  *See In re Greystone*, 995 F.2d at 1277 (determining that a plan may be confirmed if at least one impaired class approves the plan and the plan fulfills the cramdown requirements of § 1129(b) of the Bankruptcy Code).  Additionally, even if this Court is incorrect in its conclusion that Classes 3 and 4 are deemed to have accepted the Amended Plan, the Amended Plan complies with § 1129(b) with respect to those classes as well.

1.     **There is no unfair discrimination with respect to Classes 3, 4, and 5.**

"[T]he concept of unfair discrimination was designed to maintain equity among creditors of equal priority." *In re Orawsky*, 387 B.R. 128, 141 (Bankr. E.D. Pa. 2008).  The Amended Plan does not unfairly discriminate among similar claims.  Rather, the Amended Plan segregates claims into five (5) classes based on priority and character of claims.  [Finding of Fact No. 47.]  The Court therefore concludes that the Amended Plan classifies claims in a permissible manner, based on

priority and discernable legal status.

To the extent that IFA suggests that the treatment it receives under the Amended Plan unfairly discriminates against IFA, this Court disagrees.  There is no question that IFA asserts that it has a lien on the Property just as Regions and Wallis assert that they have liens on the Property; to this extent, there is some similarity to their respective claims.  However, there the similarity ends. Regions and Wallis each have undisputed first liens on the Property, [Findings of Fact No. 13 & 15], whereas IFA has a disputed second lien.  [Findings of Fact Nos. 18 & 21.]  Moreover, there is no equity in the Property to pay the second lien, in part much less in whole.  [Finding of Fact No. 50.] Accordingly, the Amended Plan's differing treatment of Regions and Wallis, on the one hand, and IFA, on the other, does not constitute discrimination towards IFA.  Not only is such treatment not discriminatory, but "secured creditors can, and usually must, be classified separately . . . because each creditor has unique collateral, requires different monthly payments, and charges different interest rates." *In re Wilson*, No. 07 B 17012, 2008 WL 268798, at *3 (Bankr. N.D. Ill. Jan. 29, 2008); *see also Bank One, NA v. Leuellen (In re Leuellen)*, 322 B.R. 648, 657-58 (S.D. Ind. 2005); *In re Powell*, 15 B.R. 465, 477-78 (Bankr. N.D. Ga. 1981); *In re Jones*, 101 B.R. 593, 594 (Bankr. W.D. Mo. 1989).

Alternatively, even if such treatment is discriminatory, it is not *unfair* discrimination.  "The Code does not prohibit unequal treatment of claims that are properly classified in different classes so long as the discrimination is not unfair." *In re Harper*, 157 B.R. 858, 864 (Bankr. E.D. Ark. 1993) (citing 5 Lawrence A. King, et al., Collier on Bankruptcy ¶ 1222.03 (15th ed.1989)).  The Bankruptcy Court for the Middle District of Tennessee made a very apt observation regarding § 1129(b)(1)'s prohibition of unfair discrimination against impaired classes in a cramdown:

> Section 1129(b)(1) prohibits the plan to "discriminate unfairly" against an impaired class that has not accepted the plan. Some courts have reduced unfair discrimination to a mechanical rule that, even if appropriately placed in more than one class, all unsecured claimholders must be paid the same percentage of claims. Although certainty in the next case is favored by this view, the statute offers no such comfort. Section 1129(b)(1) prohibits only *unfair* discrimination, not *all* discrimination. The mechanical approach threatens the vitality of the word "unfairly" in § 1129(b)(1).

*In re Aztec Co.*, 107 B.R. 585, 588-89 (Bankr. M.D. Tenn. 1989) (citations omitted) (emphasis added).  Indeed, the Fifth Circuit has held that "a scheme favoring a fully secured creditor over an unsecured one" is not a violation of the Chapter 13's "unfair discrimination" requirement and that "[t]his kind of distinction is commonplace under Chapter 11."  *Friendly Fin. Discount Corp. v. Bradley (In re Bradley)*, 705 F.2d 1409 1411 (5th Cir. 1983).  Likewise, any plan, like the Amended Plan in this case, that provides for differential treatment among secured creditors based on the priority of their respective liens does not discriminate unfairly.  *See In re Elk Creek Salers, Ltd.*, 286 B.R. 387, 394-95 (Bankr. W.D. Mo. 2002).  Here, IFA complains that the class comprised of its secondary lien is unfairly discriminated against under the Amended Plan due to its receiving less favorable treatment than the classes containing Regions and Wallis's primary liens.  Because the Amended Plan distinguishes IFA's claim based on (1) its disputed status, and (2) its secondary priority, such treatment is not unfairly discriminatory.  Rather, the Amended Plan provides IFA with the same treatment that IFA would receive in a Chapter 7 liquidation or under a foreclosure sale held pursuant to state law.

Additionally, Class 4, comprising all unsecured claims against the Debtor, receives the same treatment that unsecured creditors normally would under the priority scheme.  Under the Amended Plan, administrative claims will be paid in cash upon the effective date; therefore, the claims that remain to be paid are secured claims and unsecured claims.  The claims in Classes 1 and 2 (Regions

and Wallis) will be paid pursuant to the assumed obligations as consented to by these two classes. Thus, Class 3 (IFA) and Class 4 (unsecureds) remain. If Class 3's lien is adjudicated to be valid in the Adversary Proceeding, then its lien will attach to all assets of the Debtor except the Property (which is being sold free and clear of all liens to the Purchaser, except the liens of Regions and Wallis). Under these circumstances, there will be no cash to pay unsecured claims unless the reorganized Debtor recovers monies from IFA in the Adversary Proceeding. On the other hand, if Class 3's lien is adjudicated to be invalid, then Class 3 will have no claim and all assets of the Debtor except the Property will be used to pay unsecured claims, either in whole or in part, depending upon how much cash is available. Thus, under the Amended Plan, the claims in Class 4 are slated to receive any cash remaining after all allowed secured claims are satisfied. Under these circumstances, the Amended Plan properly treats Class 4 in a manner that comports with the priority scheme contained in 11 U.S.C. § 507 and does not unfairly discriminate against Class 4.

The Amended Plan does not unfairly discriminate against Redwood's partnership interest in Class 5 for the same reason. Given that there is no equity in the Property, the Amended Plan properly provides that the partnership interest holders in Class 5 receive nothing.[22] *See, e.g.*, *In re Source Enters., Inc.*, No. 06-11707(AJG), 2007 WL 2903954, at *8 (Bankr. S.D.N.Y. Oct 1, 2007) (concluding that a Chapter 11 plan did not unfairly discriminate against a class of equity interests where the plan provided that the equity interest holders would receive nothing); *In re Hollywood Casino Shreveport*, No. 04-13259, 2005 WL 4796585, at *11 (Bankr. W.D. La. July 6, 2005) ("The

---

[22] Aside from the Property, the only other assets of the Debtor are relatively little cash and accounts receivable, plus the claims in the Adversary Proceeding. Adding the value of these assets to the value of the Property does not change this Court's conclusion that the Debtor's aggregate liabilities exceed the aggregate current fair market value of its assets and that, therefore, the partnership interests held by Morrow and Redwood have no value. [Finding of Fact No. 50.]

Plan does not unfairly discriminate against and is fair and equitable to Old Equity Interests because the Debtors' assets are worth less than the [a]llowed secured and unsecured claims against their estates, and accordingly holders of equity interests are not entitled to any distribution on account of their interests . . . .").

Therefore, because the Amended Plan properly classifies claims and interests according to priority, the Amended Plan does not unfairly discriminate between classes.

### 2.      The Amended Plan is fair and equitable with respect to Classes 3, 4, and 5.

To achieve cramdown confirmation under § 1129(b), the Amended Plan must also be fair and equitable to all impaired classes that have not accepted the Amended Plan.  11 U.S.C. § 1129(b)(1). The Court need only determine that the Amended Plan is fair and equitable to Class 5, the only class that is deemed to have rejected the Amended Plan.  However, even though this Court has determined that Class 3 and Class 4 are deemed to have accepted the Amended Plan pursuant to the holding in *Ruti-Sweetwater*, in the event that the Court is incorrect in its interpretation and application of *Ruti-Sweetwater*, the Court will, out of an abundance of caution, also analyze whether the Amended Plan is fair and equitable to Classes 3 and 4.

### a.      As to Class 3—IFA's Disputed Second Lien

The Court notes, at the outset, that "the Bankruptcy Code does not bar the sale of equity to an insider."  *Beal Bank, S.S.B. v. Waters Edge Ltd. P'ship*, 248 B.R. 668, 680 (D. Mass. 2000). Indeed, "there is no prohibition against a private sale or against a sale to insiders; and there is no requirement that the sale be by public auction."  *Penn. Mut. Life Ins. Co. v. Woodscape Ltd. P'ship (In re Woodscape Ltd. P'ship)*, 134 B.R. 165, 174 (Bankr. D. Md. 1991).  Here, the sale of the Property proposed by the Debtor in the Amended Plan is no different from a sale free and clear under

11 U.S.C. § 363.

Thus, even if Class 3, consisting solely of IFA's disputed second lien, is not deemed to have accepted the Amended Plan, the Amended Plan is nevertheless fair and equitable to Class 3 pursuant to the requirements of 11 U.S.C. § 1129(b)(2)(A). "[W]here more than one lien exists, the junior lienholder risks being unsecured and, further, . . . the unsecured junior lienholder has no right to be treated more favorably in bankruptcy than in foreclosure." *Obeid v. Suntrust Bank (In re Obeid)*, No. 08-19917PM, 2008 WL 5273671, at *1 (Bankr. D. Md. Dec. 15, 2008) (quoting *Johnson v. Asset Mgmt. Group, LLC*, 226 B.R. 364, 369 (D. Md. 1998) (internal marks omitted). The Sixth Circuit has held that "if a claimant's lien on the debtor's homestead has no value at all, . . . the claimant holds an unsecured claim and the claimant's contractual rights are subject to modification by the plan." *In re Lane*, 280 F.3d 663, 669 (6th Cir. 2002). Additionally, in a § 363 sale—which is essentially what the Amended Plan is proposing—"if the proposed sale price is the best obtainable under the circumstances of a particular case, then the fact that the junior lienholders may receive little or nothing from the proceeds of the sale would not, standing alone, constitute reason for disapproving the proposed sale." *Hatfield Homes, Inc. v. Pennview Savings Ass'n (In re Hatfield Homes, Inc.)*, 30 B.R. 353, 355 (Bankr. E.D. Penn. 1983). This is so because, as is aptly put in a popular song from the '70s, "nothing from nothing leaves nothing." Billy Preston, *Nothin' From Nothin'*, *on* The Kids and Me (A&M Records 1974).

Such is precisely the case here. IFA cannot complain that the Amended Plan is unfair and inequitable with respect to its junior lien if the Amended Plan provides for the same treatment that its lien would receive in a foreclosure sale held under applicable Texas law. IFA's complaint is with Texas's perfection and priority laws rather than the Debtor's Chapter 11 Amended Plan. A junior

lienholder in Texas risks the entire value of its lien being extinguished by a senior lien exceeding the value of the collateral. *Mays v. Bank One, N.A.*, 150 S.W.3d 897, 900 (Tex. App.—Dallas 2004, no pet.) ("We recognize the well-established rule that following the valid foreclosure of a senior lien, junior liens, if not satisfied from the proceeds of sale, are extinguished.") (citing, inter alia, *Nat'l W. Life Ins. Co. v. Acreman*, 425 S.W.2d 815, 817 (Tex. 1968)); *Conseco Fin. Serv. Corp. v. J & J Mobile Homes, Inc.*, 120 S.W.3d 878, 885 (Tex. App.—Fort Worth 2003, pet denied) (stating "the common-law rule that foreclosure of a senior lien extinguishes all junior liens" and positing that "if junior liens were to survive a foreclosure sale, buyers would have no incentive to bid on the property"). To the extent that IFA's junior lien is valid, it would only receive any excess from the proceeds of the Property sale that exceeds the claims of Regions, Wallis, and the taxing authorities—i.e. the senior lienholders; and, here, there is no such excess because there is no equity in the Property.

In other words, the Amended Plan provides that IFA will receive the "indubitable equivalent" of the value of its lien, thereby satisfying § 1129(b)(2)(A)(iii). *See also id.* at 355 n.6 ("The legislative history accompanying § 363(f) provides that a '[s]ale under this subsection is subject to the adequate protection requirement."). Such treatment, especially in the context of a *liquidating* plan, is fair and equitable, as it simply mirrors the treatment that IFA would receive in a normal foreclosure sale. The Court also notes that, according to the credible testimony of Carter and Morrow, the consideration that will be paid to the reorganized Debtor for the Property exceeds the Property's fair market value—an outcome that would almost certainly not occur in a foreclosure sale in today's financial climate. [Findings of Fact No. 48 & 54.] If IFA truly believes that the Property is worth more than the price to be paid by the Purchaser, it should have submitted an offer to the

60

Court for the Property or filed a competing plan of reorganization, as it had ample opportunity to do so. [Findings of Fact No. 12 & 28.]   IFA's inaction in this regard further suggests that the Amended Plan's treatment of Class 3, comprised solely of IFA's disputed lien, is fair and equitable.

Finally, as discussed above, *supra* section IV(C), IFA does not have standing to object on the grounds that the Amended Plan violates the absolute priority rule contained in § 1129(b)(2)(B)(ii) because IFA is the holder of a *secured* claim.   The absolute priority rule only applies to a class of *unsecured* claims, not to a class of secured claims or equity interest holders.  *See, e.g., In re Arden Props., Inc.*, 248 B.R. 164, 173-74 (Bankr. D. Ariz. 2000) ("[T]he absolute priority rule applies only to unsecured classes, not to secured claims, the requirements for which are separately set forth in § 1129(b)(2)(A), which says nothing about the timing of the repayment nor any comparison to the treatment of any other class.").

### b.    As to Class 4—All Unsecured Claims

The Amended Plan is fair and equitable to Class 4 because it satisfies the "absolute priority rule" embodied in 11 U.S.C. § 1129(b)(2)(B)(ii).[23]    *See In re Greystone*, 995 F.2d at 1282 (interpreting the fair and equitable requirement of § 1129(b)(2)(B) to require that a plan "not redistribute a dissenting creditor's property rights to those with a junior right or interest in the debtor").   Simply stated, a plan violates the absolute priority rule if a class of unsecured creditors receives less than the full amount of its claims while a junior class receives something "on account of" its interest.  11 U.S.C. § 1129(b)(2)(B)(ii) ("[T]he holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan *on account of* such junior claim

---

[23] For additional discussion of the absolute priority rule as it relates to IFA, whose disputed lien comprises Class 3, and the unsecured claims in Class 4 see *supra* section IV(C).

or interest any property." (emphasis added)).

Here, this is not the case. The crux of IFA's argument on Class 4's behalf is that because the Amended Plan allows Morrow, a 50% owner of the Purchaser, to receive estate assets, Morrow, as a partnership interest holder of the Debtor in Class 5, is receiving something "on account of" his interest in the Debtor—which therefore violates the absolute priority rule. However, to the extent that Morrow will be receiving estate property as a 50% owner of the Purchaser, he is paying "new value" for the Property. [Finding of Fact No. 54.] Therefore, IFA's contention that the Amended Plan is not confirmable due to a violation of the absolute priority rule has no merit; there is no such violation.

A different way of expressing this view is to say that the "new value exception" to the absolute priority rule applies.[24]  For the new value exception to apply, there must be (1) a contribution that is new capital; (2) the contribution must be necessary for a successful reorganization; (3) the contribution must be in money or money's worth; and (4) the contribution must be reasonably equivalent to the value of the property acquired by the Purchaser.[25]  *See LaSalle*,

---

[24] The term "new value" *exception* may be a misnomer. Where a junior interest holder contributes "new value" to a reorganized debtor to retain his interest or receive some value under the plan, he is not receiving value "on account of" his interest, but rather is receiving value in exchange for new consideration. Thus, the new value "exception" seemingly refers to a transaction that falls outside the scope of the absolute priority rule altogether.  *See In re Snyder*, 967 F.2d 1126, 1130 (7th Cir. 1992) ("[S]everal commentators have recently argued powerfully that the new value 'exception' is not an exception at all, but is consistent with the absolute priority rule as codified in § 1129(b)."); *BT/SAP Pool C Assocs. v. Coltex Loop Central Three Partners, L.P.*, 203 B.R. 527, 534 (S.D.N.Y. 1996) ("[T]he new value 'exception' is not an exception but is instead a clarification of the absolute priority rule itself.").

Although the term "new value exception" may be a misnomer, this Court will continue to use this nomenclature because it is so common within the bankruptcy lexicon.

[25] Morrow is an insider as that term is defined by 11 U.S.C. § 101(31)(A) because he owns 50% of the Debtor. To the extent that the Purchaser is owned by Morrow and his wife, an argument can be made that the Purchaser is equivalent to Morrow for purposes of applying the new value exception to the absolute priority rule. Accordingly, in reviewing the elements that need to be satisfied for the new value exception to apply, Morrow and the Purchaser are considered to be one and the same.

526 U.S. at 445 (citing *Case v. Los Angeles Lumber Products Co.*, 308 U.S. 106 (1939)).

In the case at bar, all of these elements are met. The consideration proposed to be given to the reorganized Debtor for transfer of the Property is as follows: (1) the Purchaser will assume the Debtor's obligations under the loan documents with Regions and Wallis (i.e. assume approximately $6.2 million of claims owed by the Debtor); (2) the Purchaser will pay all allowed tax claims owing on the Property (i.e. approximately $700,000.00); (3) the Purchaser will pay all allowed administrative claims owed by the Debtor's estate (i.e. approximately $300,000.00); (4) Morrow will waive his administrative claim against the estate (i.e. Morrow's claims arising from his personal payment of approximately $700,000.00 of various claims against the estate); and (5) the Purchaser will fund the reorganized Debtor's litigation of the Adversary Proceeding.[26] [Finding of Fact No. 54.]

The consideration described above, taken together as a whole, satisfies the elements of the new value exception because this consideration is a contribution of new value that is at least equivalent to the value of the Property, is in money or money's worth, and is absolutely necessary for a successful reorganization. Moreover, because the Debtor, by way of Carter's testimony, has sufficiently shown that the Purchaser is paying "more than anyone else would pay" to acquire the Property, the new value exception is satisfied. *LaSalle*, 526 U.S. at 453 n.26 (positing that where the debtor can show that "no one else would pay as much" as the equity interest holder, the new value exception is satisfied).

---

[26] Neither the Amended Disclosure Statement nor the Amended Plan set forth how much money the Purchaser will provide to fund the litigation. When this Court made its oral ruling on December 30, 2008, it expressly stated that the Purchaser will be required to provide at least $25,000.00 to fund this litigation. This Court has the power to modify the Amended Plan, *see supra* note 13, and imposing this $25,000.00 floor is a non-material modification that is appropriate given the nature of the dispute between the Debtor and the defendants in the Adversary Proceeding.

Although this Court relies on *LaSalle* for its articulation of the legal standard for the new value exception, the Court notes that *LaSalle* did not hold that the new value exception is a "live" doctrine—nor did it hold that this exception is defunct. Rather, *LaSalle* held that under the specific facts of that case, the new value exception, assuming that it is a live doctrine, did not apply. The facts in *LaSalle* are highly distinguishable from the facts in the case at bar. In *La Salle*, the debtor proposed a plan whereby the partners would retain their partnership interest in the reorganized debtor in exchange for contributing new capital. However, there was no indication that the partners were paying fair value and, more importantly, the plan allowed no one other than the partners to purchase such an interest. Under these circumstances, the Supreme Court held that the new value exception was not satisfied, as "plans providing junior interest holders with exclusive opportunities free from competition and without benefit of market valuation fall within the prohibition of § 1129(b)(2)(B)(ii)." *La Salle*, 526 U.S. at 458. Notably, the Supreme Court expressly refrained from considering whether "an opportunity to offer competing plans" or "a right to bid for the same interest sought by old equity" might warrant an application of the new value exception. *Id.*

In the case at bar, both IFA and Redwood received ample notice of the confirmation hearing on the Debtor's Amended Plan and of the Debtor's intent to sell the Property to the Purchaser. [Finding of Fact No. 39.] Despite having received such notice, and despite having had an 84-day window during which to file their own plans of reorganization (which could have proposed to sell or otherwise dispose of the Property in some fashion other than the manner set forth in the Amended Plan), [Finding of Fact. No. 28], IFA and Redwood chose not to do so. Moreover, instead of filing and prosecuting their own respective plans of reorganization, they could have submitted offers to YHI to purchase the Property; yet, they chose not to do so even though, as Carter testified, YHI was

64

looking for anyone to submit a written offer for any amount. [Finding of Fact No. 12.] Thus, IFA and Redwood knowingly chose to sit on their hands and remain inactive despite having ample notice and opportunity to act.

Based on these distinctions, this case falls within both hypothetical fact patterns that the Supreme Court refrained from considering. The Court concludes that this case presents an appropriate factual basis for application of the new value exception. Accordingly, the Plan is fair and equitable as to Class 4.

### c.    As to Class 5—Morrow and Redwood's Partnership Interests

To be fair and equitable to a class of interests, the Amended Plan must either provide: (a) that each holder of an interest of such class receive or retain on account of such interest property of a value, as of the effective date of the plan, equal to the allowed amount of such interest; or (b) that the holder of any interest that is junior to the interests of such class receive or retain nothing under the Amended Plan. 11 U.S.C. § 1129(b)(2)(C). The second prong of the fair and equitable requirement with respect to an impaired class of non-accepting interests is not implicated here because there is no class junior to Class 5 under the Amended Plan.

Although Class 5 receives nothing under the Amended Plan, this result comports with § 1129(b)(2)(C)(i) because the "value" of Redwood and Morrow's interest is zero. [Finding of Fact No. 50.] This Court has already determined that the sale of the Property proposed under the Amended Plan is the most commercially viable, given the state of today's real estate market. [Finding of Fact No. 48.] Even with the substantial consideration paid by the Purchaser, there is no equity in the Debtor's assets to be distributed to the partnership interest holders. Therefore the "value" of the interests in Class 5 is nothing—which is precisely why it is proper for the Amended

Plan to treat these interests as having no value.  The Amended Plan's treatment of Class 5 is therefore fair and equitable.

For the reasons stated above, the Court concludes that the Amended Plan is fair and equitable to all impaired, non-accepting classes and should be confirmed pursuant to §§ 1129(b).

## I.    The modifications to the Amended Plan are proper pursuant to 11 U.S.C. § 1127(a).

The Amended Plan was modified by the Debtor on December 17, 2008, [Finding of Fact No. 41], but such modifications were non-material and therefore the Debtor was not required to adhere to the strict requirements of 11 U.S.C. § 1125.  Such disclosure is required "only when and to the extent that the debtor intends to solicit votes from previously dissenting creditors or when the modification materially and adversely impacts parties who previously voted for the plan." *In re Am. Solar King Corp.*, 90 B.R. 808, 823 (Bankr. W.D. Tex. 1988).  Here, the Debtor did not intend to solicit acceptances from dissenting classes when filing the December 17, 2008 modifications.  Additionally, the modifications do not "materially and adversely impact[]" Regions or Wallis, the only two classes who previously voted for the Amended Plan.  The non-material character of the modifications is highlighted by the fact that Regions and Wallis, who had notice of the Debtor's modifications, have not objected to them.  *See id.* at 824 ("A modification is material if it so affects a creditor or interest holder who accepted the plan that such entity, if it knew of the modification, would be likely to reconsider its acceptance.") (quoting 8 Collier on Bankruptcy, para. 3019, p. 3019-3 (5th ed. 1987)).

Additionally, pursuant to this Court's oral findings and conclusions issued on December 30, 2008, this Court  makes the following non-material modifications to the Amended Plan to ensure that it complies with the elements of § 1129:  (1) the provision reserving to the reorganized Debtor

66

the right to bring unspecified causes of action will be deleted; (2) the Purchaser will be required to provide at least $25,000.00 to fund the Adversary Proceeding; (3) assets are not to be re-vested until the Adversary Proceeding is concluded; (4) the Debtor will not receive a discharge due to the fact that it has proposed a liquidating plan; (5) Regions shall release its lien on the Debtor's cash and accounts receivable; and (6) no third-party releases are provided for under the Amended Plan.[27]

## V. CONCLUSION

In his closing argument at the confirmation hearing, McDonald, counsel for Redwood, argued that it was unfair and inequitable for the Court to confirm the Amended Plan because Redwood's partner, Morrow, stood to gain a windfall by virtue of his family-controlled entity (i.e. the Purchaser) taking title to the Property. The evidence does not support any such argument. Just the contrary: the evidence shows that the Purchaser is paying consideration well in excess of the current fair market value of the Property *and* that the value of the Property will, for the foreseeable future, continue to decrease.

Of course, there is little doubt that Morrow, through the Purchaser, is hoping—indeed, speculating—that after the Purchaser takes title to the Property, its value will increase and that eventually the Purchaser can generate a handsome profit by owning this asset, either through selling it or developing it. There is nothing unfair or inequitable about such a scenario or the profit-seeking motive behind it because the Purchaser, through Morrow, is giving substantial consideration in exchange for receiving title to the Property. Included as part of this consideration is the assumption by the Purchaser of the obligations that the Debtor owes to Regions and Wallis. If the Purchaser

---

[27] The fifth and sixth modifications are made pursuant to stipulations made at the confirmation hearing following questions posed by the Court about these issues.

pays off these obligations, then the present obligors on these debts—i.e. not only the Debtor, but its partners, Morrow and Redwood, who are also guarantors, [Findings of Fact No. 13 & 15]—will be relieved of their personal liability. Thus, if anything, the Amended Plan is very fair and equitable towards Redwood (and Zamorano) because they pay nothing while Morrow pays a substantial amount; yet, they will likely receive relief from their personal liability to Regions and Wallis. Further, while Morrow may wind up making a profit, he could just as easily end up losing money, and the $700,000.00 now coming out of his pocket to make the Amended Plan feasible will have been for naught. For all of these reasons, the Court concludes that Redwood's objections are without merit.

Just as Redwood took a business risk in entering into a partnership with Morrow to purchase and develop the Property, so did IFA assume a similar risk in taking a second lien on the Property. IFA, which is clearly a sophisticated lender, knew full well that when it took this junior lien, there was a risk that senior liens would be foreclosed and thereby render IFA's second lien absolutely worthless. This scenario is exactly the one that has played out in this case, with one twist: Here, the senior lienholders, both of whom have the undisputed right to foreclose immediately, have agreed not to foreclose but rather to accept the Amended Plan because one of the partners, Morrow (through the Purchaser), has agreed to assume the debts of the Debtor and to pay all taxes on the Property and the attorneys' fees and costs incurred by these lenders in collecting their loans. The Purchaser, of course, wants the Property free and clear of all junior liens in return for assuming these obligations. The consideration that the Purchaser is paying under the Amended Plan is more than, or at least equivalent to, what it would have to pay at the foreclosure sales that the senior lienholders would clearly hold if the Amended Plan was not confirmed. That is, the Purchaser, under the foreclosure

scenario, would take the Property free and clear of IFA's junior lien pursuant to applicable Texas law—unless, of course, IFA outbid the Purchaser at the foreclosure sales. IFA's failure to submit any offer to YHI in this case, and its like failure to file and obtain confirmation of its own plan of reorganization, underscores that IFA has no desire—or perhaps simply does not have the financial means—to match the consideration that the Purchaser is giving under the Amended Plan or would give in a foreclosure sale.

In sum, the elimination of IFA's lien on the Property in this case is exactly what would happen in a foreclosure sale under applicable Texas law if this Chapter 11 case did not exist. Accordingly, IFA's treatment under the Amended Plan is both fair and equitable. Indeed, because Regions is voluntarily releasing its lien on the Debtor's cash and accounts receivable, the Amended Plan's treatment of IFA is more than fair and equitable. If IFA can prove that its lien is valid at the Adversary Proceeding, then all cash and receivables will go to pay down the debt owed to IFA by Redwood; whereas, if the Amended Plan is not confirmed and the case is converted to a Chapter 7, Regions's superior lien would remain on the cash and receivables, and IFA would receive nothing.

For all of the reasons set forth herein, the Court concludes that the Amended Plan, as modified, meets the applicable requirements for confirmation under 11 U.S.C. § 1129. An order consistent with this Memorandum Opinion will be entered on the docket simultaneously with the entry on the docket of this Opinion.

Signed on this 20th day of January, 2009.

Jeff Bohm
United States Bankruptcy Judge